McLean *vs.* Clark *et al.*

HUGH MCLEAN, plaintiff in errror, *vs.* WILLIAM W. CLARK *et al.*, defendants in error.

1. When on the trial of a bill filed by the vendor of property to set aside the sale as fraudulent and void, on the ground that the defendants had falsely represented to the complainant that his life and property were in danger, by reason of the indignation of the people against him, for having raised over his property a British flag to protect it against a raid of the Federal forces during the late war:

*Held,* That it was error in the Court to rule out the testimony of a witness, who was present at the transaction, as follows:

"The sale in all its features was a compulsory act, and affected through the misrepresentations of his legal adviser, who negotiated the whole transaction;" and, again, "the sale was not of his own free will and accord;" and, again, "Clark came to McLean several times, and on each occasion tried to succeed in impressing McLean with the belief that his safety could only be secured by relinquishing his interest in the factory and leaving the country;" and, again, "the impression in my mind was, and still is, that McLean would certainly not have sold the property if he had not believed that his own life and the lives of his family were in danger, and that this belief was caused by the position represented by Clark;" and, again, "McLean was fraudulently led by Clark to believe that his life would be endangered by his retention of the property."

The statements of this witness, in connection with his other statements not ruled out, are statements of facts, or opinions of the state of McLean's mind, based on facts stated, and were competent evidence to be judged of by the jury, from the witness' means of knowing the facts as stated by him.

2. Declarations of a vendor of property, as to his motives for the sale, made at the time and during the progress of the sale, and even so soon thereafter as to be free from all suspicion of after-thought, are admissible evidence on a trial as to the validity of the sale.

3. Where A is attorney at law for B in a controversy with C, and C makes to the attorney certain statements and propositions to be communicated

to B, and at the same time proposing that if B consents to the propositions the attorney should be employed in the matter proposed by B and C, and B declines the proposition:

*Held,* That B may use the attorney as a witness to prove the statements, and that under the circumstances C cannot claim that they are privileged communications between client and attorney.

4. Where a bill of exceptions, properly certified by the Judge, states as a fact, that on the trial he failed to give to the jury certain written requests to charge tendered by the complainant's counsel, and it appears from the record that the Judge overruled a motion for a new trial for such failure, stating as the reason for his judgment that he did in fact give the requests to charge to the jury as asked:

*Held,* That this Court is bound by the facts, as stated and certified in the bill of exceptions, and not by the reasons given by the Judge in his judgment overruling the motion for a new trial, and as said requests were proper to be given in charge, the party is entitled to a new trial.

5. Where A, with an understanding between himself and B and C, that they will be jointly interested with him, purchases property from D in his own name, and in the purchase commits a fraud upon D, and afterwards B and C are let into the purchase by A, as joint purchasers with him:

*Held,* That B and C cannot claim to be innocent purchasers without notice of A's fraud. As they stand in his shoes, they are charged with his act, whether they had notice or not, and if the fraud in fact exists, the purchase will be set aside against all.

6. When on a trial a question arose as to the value of certain machinery of a cotton factory:

*Held,* That it was error in the Court to exclude from the jury evidence that certain persons, responsible men, acquainted with the value of cotton machinery, had, in good faith, about the time inquired of, authorized the witness to offer, in cash, a certain sum for the same.

7. It is error in the Court to charge the jury as to the law upon a state of facts in relation to which there is no evidence before the jury.

8. It is error in the Court in charging the jury, on the trial of a bill filed, to set aside a sale on account of fraud to read to the jury the statements in the bill, even to the minutest particulars of the plaintiff's case, and then say to the jury if you find these statements in the bill sustained by the proof, to find for the complainant, if not, to find for the defendant. It is the duty of this Court to separate the material from the immaterial statements in the bill, to present the real substantial issues to the jury, and a general charge that all the plaintiff's statements must be supported by the proof, is calculated to mislead the jury.

9. It is error in the Court to charge the jury in general terms, that if a witness is shown to have sworn falsely in one particular, he is not to be believed at all, without explaining to the jury that the point in

McLean *vs.* Clark *et al.*

which the untruth is stated must be material, and that the witness must been willfully and knowingly sworn falsely in such material matter.

10. It is error in the Court to charge the jury, that if the plaintiff has sworn to one state of facts, and the defendant contradicts him, the jury are to leave the parties as it finds them, unless other witnesses corroborate one or the other. The jury are to judge, as in other cases, from the circumstances, and if they believe, one or the other, so ought their verdict to be.

11. In giving rules for weighing evidence to the jury, the Court should be careful to state them as general rules, subject to be controlled and modified by the case before them, as made by all the testimony.

12. Where the testimony of one party was mostly by deposition, and the other from witnesses examined upon the stand in the presence of the jury :

*Held,* That it was improper for the Court, in his charge on a material point, to say to the jury that they were to consider the evidence as it was given in from the stand.

13. Where there was on trial a bill filed to set aside as fraudulent a deed charged to have been procured by false statements, which caused the vendor to sell at a gross under-value, through fear of danger to his life and property from persons who were angry at him for raising a British flag over his property to protect it from the Federal forces during the late war, and one of the defenses was lapse of time from 1864 to 1868 :

*Held,* That under the circumstances of the country, of which the Court will take judicial knowledge, the presumption of acquiescence, from lapse of time, does not exist, and is not an element to be considered by the jury.

14. Where a bill to set aside a sale as fraudulent is defended·on the ground of waiver, because the complainant, after the discovery of the fraud, accepted the consideration and did other acts affirming the sale :

*Held,* That to make these acts conclusive of waiver and acquiesence, it must clearly appear that at the time the acts were done the vendor was free from the influence and control of the fraudulent statements, and that the act set up as a waiver, was in fact done by the complainant. The mere receipt of money from his general agent, paid to the agent by the vendee, is not sufficient, it not appearing that the vendor knew he.was, by such receipt, accepting the money of the vendee under the contract, or that he authorized the agent to accept the. money, or did knowingly some act showing that he recognized the contract, and was insisting upon the. same.

Equity. Witness. Opinion. Declarations. Attorney and client. Confidential communications. Innocent purchaser. Charge of Court. Credibility of witness. Evidence. Acquiescence. Waiver. False representations. Before Judge GREENE. Newton Superior Court. March Term, 1872.

McLean *vs.* Clark *et al.*

Hugh McLean filed his bill to the September Term, 1868, of Newton Superior Court, against William W. Clark, John Harris, and Enoch Steadman, containing, substantially, the following allegations: That in 1860 complainant rented from Charles Camp and Noah Phillips, who were then doing business under the firm name of Phillips & Camp, a frame building and water power, situate on Yellow river, from November 1st, 1860, to November 1st, 1868, at the rent of $750 00 per annum; that complainant procured machinery suitable for a cotton factory, at a cost of $12,000 00, in good money, and placed it in said building; that late in the summer of 1864, fearing a raid in the vicinity of said factory from the Federal forces, complainant hoisted a British flag, as a means of protection; that said factory was then making a handsome profit, and many persons had expressed to complainant a desire to purchase the same, and amongst others, the defendants were the most eager; that when said flag was raised the following note was sent to complainant from the factory on the opposite side of the river, belonging to the defendant, Steadman:

"COVINGTON MILLS, July 22d, 1864.
"HUGH McLEAN:

"*Dear Sir*—We see a flag on your factory. If it is a Confederate flag, all right. If otherwise, it must be hauled down at once, or it will be taken down in short order.

(Signed)          "W. F. KENNEDY, and others,
                                "Of Covington Mills."

That soon after the receipt of the above note, the defendant Clark came to complainant, and said that there had been a public meeting of the citizens in the town of Covington, and the result was, that they had threatened to take complainant's life, unless he would leave the county; that defendant had come to complainant as a friend and a "Mason on the square," to warn him and to advise him for the best; that defendant then urged upon complainant to sell to him his factory, including thirty bales of cotton, and he, under the influence of fears thus aroused, consented to take $60,000 00 for said factory,

machinery and cotton; that complainant, upon reflection, fearing that he had been duped by a deep laid scheme, and not desiring to take $60,000 00 in Confederate money, for property worth $35,000 00 in good money, and being informed by one of his managers, who had been to Covington, that no such meeting had taken place, refused to comply; that defendant Clark procured the sheriff to come and intimidate complainant, said sheriff being accompanied by the defendants Harris, and Steadman, also by Hugh and Robert White; that these persons came to complainant's house, and paid to him $60,000 00, in Confederate money, which he refused to accept until threatened by the sheriff with an arrest, complainant remarking at the time that he would rather see the property burnt up than submit to such a sacrifice; that the contract was made in the name of the defendants, Clark and Harris, though complainant learned soon afterwards that the defendant Steadman was at the time interested in said purchase, and perhaps the two Whites also; that it was but a short time after said forced sale before the defendant, Steadman, was exercising acts of control over said factory; that said forced sale took place the latter part of July, or the 1st of August, 1864, and soon thereafter said defendants shipped about one-half of the machinery in said factory out of the State, which has probably passed into the hands of third persons; that subsequently said factory with the remaining machinery was destroyed by fire; that at the time of the said forced sale nothing was said about the rent notes due to Phillips and Camp, complainant supposing that said defendants would of course pay them; that defendants refused to meet two of said notes, and complainant paid them, but after he discovered that the defendant, Steadman, was owning and controlling said notes, complainant resolved to pay no more until the whole transaction should undergo a judicial investigation; that soon after the trade was effected, complainant suspected that the defendant, Steadman, was in some way interested therein, but this suspicion was somewhat relieved in August, 1866, when said defendant urged the propriety of complainant's instituting suit against Clark, assur-

McLean *vs.* Clark *et al.*

ing him that his aid should be privately given, but he did not wish to be known as a party; that said defendant, Steadman, has instituted suit on the rent note due November 1st, 1867, for $750 00 against complainant, yet said Steadman, in August, 1866, through a third person, proposed to pay to complainant the money which he had before that time paid to said Camp for rent, and also to pay one-half the expense of the litigation against Harris and Clark, if complainant would divide with him the recovery; that defendants refuse to settle; that complainant waives discovery. Prayer, that defendants may be decreed to pay to complainant what may be due for said machinery and cotton after a fair accounting, together with lawful interest thereon, less the amount received by complainant at a fair valuation; that the defendant, Steadman, be enjoined from prosecuting his said suit for rent until the further order of this Court; that the writ of subpœna may issue.

The bill was sanctioned on May 20th, 1868, and an injunction ordered to issue as prayed for.

The defendant, William W. Clark, answered said bill, substantially, as follows: Defendant admits the excited state of the county in 1864; the Gerard raid was the most successful made by the Federals, and it was at the approach of this raid that the flag was hoisted by complainant; this was regarded by the citizens of the county as disloyalty, especially as before this time some trouble had arisen by reason of an alleged failure on complainant's part to furnish the soldiers' families with thread, as other factories had cheerfully done; considerable feeling existed between complainant and the operatives of his factory, and the operatives of the Covington Mills, as to the use of the water power; the charge that defendant had sought to purchase complainant's property is utterly and wholly false, as he had no knowledge of its value or capacity, nor had he any desire to purchase it until the suggestion came from complainant himself, as will be hereinafter explained; knows nothing about the note set forth in the bill as having been sent by Kennedy and others; the charge in reference to defendant's visit to complainant's house, and the conversation

McLean *vs.* Clark *et al.*

about the alleged meeting in Covington, is "the invention of a shameless liar, and in all things unworthy;" the charge in reference to the causes which induced complainant to refuse to comply with his contract of sale is "without even the shadow of truth;" the charge in reference to the intimidation of complainant by this defendant, the sheriff and others, "is false, and could only be made by a man given to all manner of lying and evil speaking;" the transfer of the property was deliberately drawn up, read over, agreed upon, signed and delivered to this defendant; the written lease of the property by Phillips and Camp was transferred at the same time; defendant has no personal knowledge when his co-defendants ejected complainant out of possession, but when the trade was made, on the night before the writings were drawn, complainant said that he would consider defendant in possession, and that complainant would only occupy some of the houses until he could move; when the writings were drawn, in the presence of the parties, this defendant, with Harris, with the knowledge of complainant, told some of the men in control, not only of the trade, but that they were now in his employ; the contract was not only fair, honest, without compulsion or mistatement, but complainant knows it, and if not insensible to shame, must feel it; the charge as to the removal of a part of the machinery this defendant believes to be true, but the time of the removal was not as early as stated; defendant states the charges as to his taking part in removal of complainant from said premises, and as to compulsion being used in the forcing a payment of rent are false, especially as defendant was not in the county at the time of the removal of complainant, and especially as defendant had no personal or other interest in the rent. The history of this entire transaction is as follows: About three or four days after the first cavalry raid, complainant sent for this defendant on business, being indebted to this defendant, at that time, about $15,000 00, Confederate value; on arriving at complainant's, defendant was told that complainant had heard of a meeting in Covington, in which Colonel Thomas F. Jones and others denounced him and made

McLean *vs.* Clark *et al.*

some threats; that he had had a difficulty with the factory people on the other side, (Steadman's) and they had threatened to cut off his supply of water; that he had raised a British flag when the raid was near to save his property, and had, on this account, been threatened even so far as with being burnt out; defendant attempted to quiet complainant's fears; complainant spoke of leaving the country and of getting out to the West Indies, and proposed to sell to this defendant the property afterwards purchased, and stated, at the same time, that he would sell to any one except Steadman, against whom he seemed to have much unfriendly feeling; defendant feeling anxious about complainant's indebtedness, inquired about his means; defendant said he had cotton at various points—Athens, Augusta and other places—and perhaps some hid out in the woods; defendant, in response to the proposition to sell, replied that he had no use whatever for factory property; that he was not familiar with such business, and could not turn it to good account; complainant persistently sought to induce defendant to purchase; defendant left him, after seeking again to quiet his fears, not, however, without sharing in them, to some extent, himself; on the same, or the next day, defendant met the defendant, Steadman, and in a conversation in reference to the Alguadon factory, (complainant's,) Steadman remarked that he would give $50,000 00 for a third interest in it; this defendant replied that, " upon such an offer, he might be taken up," whereupon Steadman said " all right;" on this, or the succeeding day, defendant saw the defendant, Harris, and communicated to him what the defendant, Steadman, had said, and further, that, by reason of complainant's anxiety to sell, this defendant believed the property could be bought cheap; defendant, Harris, replied that he would not give much for any property, especially factory property, as it was more likely to be destroyed in such times than other property; but, if the property could be bought as advantageously as this defendant supposed, he would take an interest, if the entire cost did not exceed $80,000 00. On the evening of that or the succeeding day, defendant returned to complainant's, when he immediately

again urged the purchase, by this defendant, of the property, offering to take $80,000 00; this defendant offered $70,000 00, which was refused, and, finally, the trade was concluded at the said sum of $80,000 00, the property being considered as delivered; this was on the evening of July 26th, 1864; that, on the succeeding day, when the papers were being drawn, complainant stated that this defendant ought to surrender a part of what was due to him, and defendant agreed to remit $5,000 00; this defendant and Harris paid $15,000 00 each for their third interests, while Steadman paid $50,000 00 for his; defendant never would have been a party to the contract had it not been for Steadman's offer of $50,000 00 for a one-third interest, and complainant's indebtedness to defendant; the whole transaction was concluded on July 27th, 1864, and on the morning of the 28th, the second raid, under Stoneman, made its appearance, and at that time, the factory property would not have brought $100 00 in gold.

This defendant escaped and lay in the woods until the Sunday after, when he was sent for by the other defendants, who insisted upon his disposing of his interest in the property, for, that if it was known that he was interested in the same, it would be destroyed; defendant on that day transferred to Dr. W. D. Conyers, his father-in-law, his interest, and at once left for Augusta, and there sold to Goodrich and Moore his one-third interest in said property, and returned within a few days to remove his family; defendant then ascertained that the defendants, Steadman and Harris, had divided up the purchase into five shares, and had sold two-fifths to Hand T. White; defendant was dissatisfied with this, but after conferring with the purchasers, Goodrich and Moore, they consented to take one-fifth instead of one-third interest; under this arrangement defendant was paid for a large part of his interest by the defendant Steadman; the consideration in the conveyance from complainant to this defendant is stated at $150,000; denies all fraudulent representation, combination and collusion.

Defendants Harris and Steadman answered the bill corroborating, so far as their knowledge went, the answer of Clark.

McLean *vs.* Clark *et al.*

Defendants demurred to the said bill for various causes. The demurrer was "sustained so far as the bill makes it a ground of equity, that Enoch Steadman procured the note for the rent of the property stated in the bill, and is seeking to enforce the same in the Superior Court of Richmond county, and prays an injunction thereon, there being no community of interest charged in the bill in that matter between said Steadman and the defendants, Clark and Harris, that in this particular the bill is multifarious."

The complainant and defendants, both, had exceptions entered of record to this decision.

The cause being for trial, and the complainant and defendants having announced ready, the case proceeded as follows :

Complainant, by his solicitors, read his bill, and the defendants their answers.

Complainant then offered and read in evidence to the jury the following testimony. ·

1st. An original instrument in writing, made and executed on the 30th day of April, in the year 1860, in the county of Newton, by Charles Camp and Noah Phillips, to the complainant, Hugh McLean, whereby the said Charles Camp and Noah Phillips, in consideration of the annual payment of the sum of $750 00, leased to the said Hugh McLean a building known as the Chair Factory, on the east side of Yellow river, at Cedar Shoals, and four other buildings situated on the same side of the river, with the privilege of extending the factory building to suit his convenience, (but not to cover more than ninety feet of the water privilege,) and the right of building any houses for the use of his hands employed in cotton concerns that he may see proper to build at his own expense, and to furnish to him the head of water on the east side of the river from the present dam as it now runs, with the privilege of the waste water from the dam at its present height ; the said lease to commence November 1, 1860, and to continue for the term of eight years ; there being an entry on the back of said original instrument of a transfer thereof to W. W. Clark by the said Hugh McLean.

2d. A deed made and executed by the said Hugh McLean, to the said William W. Clark, bearing date on the 27th day of July, in the year 1864, and attested by George Dobson and John W. Barr, in which said deed it is recited that for and in consideration of the sum of $150,000 00 in hand paid, the receipt whereof was thereby acknowledged, the said Hugh Mc-Lean had granted, bargained, sold and conveyed unto the said William W. Clark, all his (McLean's) right, title and interest in and to the cotton factory in said county known as the Alguadon factory, and privileges, no matter what they might be, either by lease, contract or otherwise. In addition to the factory, the buildings, the attachments to said factory, the machinery, the water power, and everything complete connected with said factory, and all of the cotton then on hand, to-wit: thirty-six bales ; if there was more cotton than thirty-six bales it was not (that is the surplus) included in said deed; all the improvements that the said Hugh McLean had made on the premises leased to him by C. Camp and N. Phillips, under date of 30th April, 1860, for eight years, and all his rights under said lease, no matter what they might be, he, the said Hugh McLean, fully and entirely sold and transferred to the said William W. Clark, his heirs and assigns, for the consideration thereinbefore named.

3d. The following letter, written and sent by the said William W. Clark to Enoch Steadman, (another defendant,) to-wit:

"CEDAR SHOALS, 27th July, 1864.

"*My dear Sir:*—It is necessary that I should see you *at once*—no delay. I have bought the McL. Factory and the preparation for running it at once. Judge Harris and myself, with you, constitute the company. Amount, one and one-half the price. Come out. Do not mind the impressment of your horses—this is more important. When you come, as *you are not* known in the transaction, notify me by note, so that I can meet you at some given place. Indeed, if you were known in the trade, it could not be made.

(Signed) "W. W. CLARK."

4th. The following deed, made and delivered by the said William W. Clark to Enoch Steadman, viz.:

"GEORGIA—NEWTON COUNTY:

"W. W. Clark having this day purchased the Alguadon Factory, in said county, and all the fixtures and interest therewith connected, under a lease from Camp & Phillips to Hugh McLean, dated in April, 1860. Now, the understanding is, that E. Steadman and John Harris are equal partners in said purchase, the sum paid for said factory being $150,000 00. The factory to be run on our joint account, and we equally interested in the losses and profits. 27th July, 1864.

(Signed) "W. W. CLARK."

5th. The interrogatories and answers of Hugh McLean, taken by commission, (the first set.) Complainant offered to read the whole of the answer of Hugh McLean to the third direct interrogatory, in which are found the following words, viz.:

"I had learned, from inquiry, that there had been no meeting of the citizens, but that the whole story was a *ruse* to get my property. I accordingly stated this to Mr. Barr and others about the factory, and that I would not surrender the possesssion."

To that part of said answer defendants objected. The objection was sustained and the testimony rejected, and complainant then and there excepted. Counsel for the complainant offered to read in evidence to the jury the answer to the seventh direct interrogatory, in which the following words are found, viz.:

"I do believe, from the facts detailed in my answer to the third interrogatory, that a conspiracy existed to obtain my property."

And again, in the same answer, the following words, viz.:

"I also believe the object Clark had in view, when making the false statements he did, was to drive me from the county, and probably from the country, in order that the forced sale might not be disturbed."

To the reading of each of these two portions of the said answer defendants objected, the Court sustained the objections and rejected the evidence, and complainant, by his counsel, then and there excepted and assigns the same as error.

6th. The interrogatories to, and the answers thereto, of James Hope, taken by commission. The fourth direct interrogatory to James Hope is in the following words, viz.:

"What was the value of the machinery that complainant had at the time of the transfer to Mr. Clark? How much was it worth? State fully all you know about the estimate of the value of that machinery."

To that interrogatory, James Hope answers as follows, viz.:

"I can only answer this interrogatory by making the following statement: During the year 1864, myself, in company with three others, determined to buy the machinery in the factory, if McLean would sell, and, in conversation in reference to the purchase, my friends deputed me to confer with McLean in reference to the purchase, and offer him $20,000 00 in American gold coin, and authorized me not to fail to make the purchase by a small difference over our offer."

To this whole answer defendants objected, and the Court sustained the objection and rejected the testimony, and complainant, by his counsel, then and there excepted, and now alleges the same as error. Defendants withdrew the cross-interrogatories to James Hope, and complainant adopted them and read them, except the answer to the third cross-interrogatory, which said interrogatory is in the words following, viz.:

"Do you, of your own knowledge, know the value of the machinery at Cedar Shoals, owned by complainant in July, 1864? If so, when did you see it? Do you know, of your own knowledge, anything of the value of said property on the day of sale, or the surrounding circumstances? If so, give them in detail, as well as how you got your information?"

To which said interrogatory, James Hope answered as follows:

"In answer to the fourth direct interrogatory, I stated what my knowledge and opinion was in reference to its value, and

McLean *vs.* Clark *et al.*

am satisfied that if we had succeeded in making the purchase at even $25,000 00 in gold, we would have made a fortune out of it. I had seen a list of the machinery and their capacity, and from my knowledge of machinery and its value, was enabled to place a fair valuation upon it, and one of the parties making the offer, a practical manufacturer, had run it and fully understood its value. I never saw it myself. I know of no change in the value or condition of the machinery at the date of our offer and the date of its sale. I have no positive knowledge, as before stated, of the circumstances attending the sale."

Counsel for defendants objected to the whole of this answer. The Court sustained the objection, and rejected the evidence. Counsel for complainant then and there excepted, and now assigns the same as error.

7th. The interrogatories to, and answers of Adam Johnson, taken by commission. The third direct interrogatory to Adam Johnson is in the following words, viz.: "If you say you know of the factory machinery owned by McLean, please state if you know what its value was at the time you knew it. Are you engaged in any business that makes you acquainted with machinery of that kind? If yea, what business? What was the value of that machinery at any time when you knew of it? Did you ever try to buy it? If yea, what price did you offer for it? State all you may know concerning said machinery, its value and character, or any other fact you may know that will benefit the complainant?"

The six last lines of that answer are as follows: "And in 1864, I authorized Mr. James Hope to purchase this machinery, if possible, at $20,000 00 in specie, a party of four desiring to purchase it. The $20,000 00 in specie was agreed between us as a minimum valuation. He was authorized to give more if necessary to a trade. I know nothing more than above stated in the premises inquired of."

To said portion of said answer defendants objected. The Court sustained the objection, and rejected the evidence.

Complainant, by his counsel, then and there excepted, and now here assigns the same as error.

8th. The interrogatories to, and answers thereto, by George Dobson, (except as hereinafter stated) taken by commission. The third direct interrogatory to George Dobson is in the following words, viz.:

"If in answer to the second interrogatory, you say the complainant owned a cotton factory, please state whether he still owns and controls the same? If you say he does not, please state when it passed out of his possession, and to whom, and under what circumstances, so far as you may know them? Was the change of possession the result of a sale made by complainant in the usual way, of his own free will and accord, or was it otherwise; and if otherwise, how otherwise?"

To this interrogatory, George Dobson answers as follows:

"Hugh McLean (complainant) does not now own the said cotton factory; I am unable to give the exact time when it passed out of his possession; it was sold to Clark, Harris and Steadman; and two brothers, whose factory, about four miles down the river, had previously been burned by the Federal forces, I believe had some interest in the purchase, also, as they run the factory afterwards; the sale in all its features was a compulsory one, and effected, through the representations of his legal adviser, Mr. Clark, who negotiated the whole transaction; the sale was not of his own free will and accord, because Mr. Clark made statements to Mr. McLean that if he did not sell the factory his life would be in constant danger."

Counsel for defendants objected to a large portion of the said answer, and the Court sustained the objection, and rejected the following words in the same, viz.: "in all its features was a compulsory one," and also the following words in the same answer, viz.: "the sale was not of his own free will and accord, because," and complainant to each of said rulings, then and there excepted, and now here assigns the same as error.

The sixth direct interrogatory to the said George Dobson is in the words following, viz.:

"Were any, and what appliances used, and how many times,

McLean *vs.* Clark *et al.*

and by whom, to force McLean to sell out and leave the county of Newton? If you say means were used to procure the above result, what were those means? State them fully and particularly."

To that interrogatory George Dobson, the witness, answers as follows, viz. :

" Clark came to McLean's several times, and on each occasion tried and succeeded in impressing McLean with the belief that his safety could only be secured by relinquishing his interest in the factory and leaving Newton county."

To that portion of said answer defendants objected. The Court sustained the objection and rejected the testimony, and complainant, by his counsel, then and there excepted, and now here assigns the same as error.

The seventh direct interrogatory to the said George Dobson is in the following words, viz. :

"State anything you may know that will benefit the complainant, McLean, as fully and particularly as if you were thereto specially interrogated."

To that interrogatory George Dobson answers as follows:

" I believe that I have stated all I can definitely recollect. The impression on my mind at the time was, and still is, that McLean would certainly not have sold the property if he had not then have believed that his own life and the lives of his family were in danger, and that this belief was caused by the persistent misrepresentations of Clark."

Counsel for defendants objected to this answer, and the Court sustained the objection and rejected all of the answer after the words " definitely recollect." Complainant, by his counsel, then and there excepted, and now assigns the same as error. Defendants withdrew the cross–interrogatories to George Dobson; complainant adopted them, and read the answers thereto, except as hereinafter stated.

The third cross-interrogatory was as follows, viz. :

" Did complainant raise a flag on his factory before, at the time, or after the first raid ? What sort of a flag was raised ? Was it the Confederate flag ? Was there any trouble or threats

of any kind used towards complainant about the flag, or any other conduct of his? Was there any excitement on account of 'his not furnishing his quota of thread for the poor or soldiers' families, by the Inferior Court or from any one else? If any of these things occurred within your knowledge, or you heard of them, state what you know on all the points on which you are questioned?"

To that interrogatory George Dobson answers as follows, viz.:

"McLean raised a flag after the raid had reached Covington, and was momentarily expected at the river, and, in fact, after Kitchens, the Confederate Provost Marshal, and several others had galloped across the bridge, which they attempted to destroy by fire. I suggested to McLean that he could probably screen himself by claiming protection as a British subject; McLean's daughter, Mrs. Foule, remarked that she had a small flag which she had brought from Augusta; it was the British Union Jack; as soon as it was put up a party came from Steadman's mills and said to McLean, that unless that flag was immediately taken down they would destroy the mill, and that he should claim no immunity which they did not possess."

To this part of the answer to said interrogatory counsel for defendants objected. The Court sustained the objection and rejected the evidence. Complainant then and there excepted, and now assigns the same as error.

The latter part of the sixth cross-interrogatory to the said George Dobson is in the following words, viz.:

"Was it (the property) not sold because of the danger by which it was surrounded; if not, what was the reason of the sale?"

To that part of the said interrogatory George Dobson answered:

"The property was not sold because of any danger surrounding it, but because McLean was fraudulently lead by Clark to believe that his (McLean's) life would be endangered by his retention of the property."

Defendant objected to that part of the said answer, and the Court sustained the objection and rejected the evidence, and complainant then and there excepted and now assigns the same as error.

9th. The interrogatories to and answers of John W. Barr, taken by commission, except as hereinafter set forth. The third direct interrogatory to John W. Barr is in the following words, viz.:

"State, if you know, whether he still has possession of said factory, and, if not, why not? How did he cease to hold possession? Under what circumstances? State fully all you know on the subject?"

To the said interrogatory John W. Barr answers as follows:

" McLean is not now in possession of the said factory; during the year 1864, I believe, during the first raid of the Federal troops east of Atlanta, and in the direction of Covington, Mr. McLean, at the suggestion of some friend, raised a British flag over or in front of the factory as a means of protecting it from the aforesaid troops, believing the same to be of great value to the people of the country at that time; on the following Monday Mr. Clark came out to Mr. McLean's house and had some conversation with complainant, who (complainant) immediately came down to the factory and told us that Mr. Clark had informed him that the citizens of the town had held a meeting and determined to hang him for raising the British flag on his factory, and he must dispose of the factory and leave the place to save his life, and the next day, I think it was, Mr. Clark and Judge Harris came out to the factory and were in conversation with Mr. McLean and Captain Dobson pretty much the whole day, as I learned, negotiating for the factory; towards evening I was sent for to where these parties were at, when Mr. Clark stated to me that he had purchased the factory, and that he desired me to remain with him in same capacity I was then filling for McLean; I remained in control of the said factory, as the superintendent of Clark for about seven or eight days; in

the meantime the Federal troops made a second raid in the direction of the mills; this time the troops came to the factory, burned the bridge and carried off a number of McLean's mules, leaving the same day; the day after the raiders left Mr. McLean stated to me that he had discovered that the factory had been taken from him by a *ruse,* and that he intended to take it back; in a day or two Mr. Steadman, Mr. Clark, Judge Harris and the two Mr. Whites, Mr. Anderson, and the sheriff, came to the factory and went up to McLean's; shortly afterwards the two Mr. Whites came down to the factory and stated that they were going to control the mill, as they had purchased an interest in it; the Whites controlled the factory for several months, when they sold out to Mr. Steadman; the company in charge then consisted of Steadman, Harris, Mr. Goodrich, of Augusta, Clark having previously sold one-fifth interest to the latter (Goodrich;) this company shipped half the machinery to North Carolina, which I followed to put up for them; I remained in charge of this mill in North Carolina till during the month of March, 1869, when I left and went to Mississippi."

Counsel for defendants objected to the following parts of that answer: "Complainant immediately came down to the factory and told us that Mr. Clark had informed him that the citizens of the town had held a meeting, and determined to hang him for raising the British flag over his factory, and he must dispose of the factory, and leave the place, to save his life."

And also, to the words in the same answer, as follows: "as I learned, negotiating for the factory."

And also, the following words in the same answer, viz.: "The day after the raiders left, Mr. McLean stated to me that he had discovered that the factory had been taken from him by a *ruse,* and that he intended to take it back."

The Court sustained the objection to each of these portions of that answer, and ruled them out, and complainant, by his counsel, then and there excepted, and now here assigns the same as error.

McLean *vs.* Clark *et al.*

10th. The following extracts taken from the books kept by the company owning Alguadon Factory, as proven by Thomas M. White:

*Copy Entries in Book read in Evidence:*

On page 88—W. W. Clark's stock account:
1864.   One-fifth interest in stock, July 28th.
Aug. 3. By one-fifth of profits, accruing to date.....................$2,987 85
Nov. 9. To cash from Thomas White to J. Harris.................... 2,987 85
Aug. 3. The stock transferred to Messrs. Moore & Goodrich, of Augusta.

On page.89—Moore & Goodrich, stock account:

| | | CR. | DR. |
|---|---|---|---|
| 1864. | One-fifth interest, Aug. 3, 1864. | | |
| Oct. 31. | By dividend No. 1, declared Nov. 9...... | | $39,150 96 |

Nov. 9.   To amount to credit on private account. $39,150 96

John Harris' stock account:

| | | CR. | DR. |
|---|---|---|---|
| 1864. | On page 90— | | |
| | One-fifth interest, July 28th, 1864. | | |
| Oct. 31. | By dividend No. 1, declared Nov. 9, 1864. | | $42,138 81 |

Nov. 9.   To amount on credit to private account. $42,138 81

On page 91—E. Steadman, stock account:

| | | CR. | DR. |
|---|---|---|---|
| | One-fifth interest, July 28th, 1864. | | |
| Sept. 19. | Three-tenths from Thomas and Hugh White. | | |
| Oct. 31. | By dividend No. 1, one-fifth declared Nov. 9. | | $42,138 81 |
| Oct. 31. | By dividend No. 1, three-tenths declared Nov. 9. | | 25,489 28 |

Nov. 9.   To amount to credit on private account. $67,628 09

On page 92—Thomas White, stock account:

| | | CR. | DR. |
|---|---|---|---|
| 1864. | One-fifth interest, July 28th, 1864. | | |
| Sept. 19. | By profits to date.............................. | | $25,145 95 |

Nov. 9.   To amount on private account.............$25,145 95
Sept. 19. Transferred to E. Steadman.

On page 93—Hugh White, stock account:

| | | CR. | DR. |
|---|---|---|---|
| 1864. | One-fifth interest, July 28th, 1864. | | |
| Sept. 19. | By profits to date............................ | | $25,145 95 |

Sept. 19. To amount to credit on private account. $25,145 95
Sept. 19. One-tenth transferred to E. Steadman.
Sept. 19. One-tenth transferred to William F. Kennedy.

On page 94—William F. Kennedy, stock account:

| | | CR. | DR. |
|---|---|---|---|
| 1864. | | | |
| Sept. 19. | One-tenth from H. White. | | |
| Oct. 31. | By dividend No. 1, declared Nov. 9........ | | $8,496 42 |

To amount credit on private account........$8,496 42

McLean *vs.* Clark *et al.*

On page 122 Account of the operations of the Alguadon mills from July 28th, 1864, to January 26th, 1865. The mills commenced operations with nothing but the machinery.

Dividend declared October 31st, 1864..................................... $210,694 05

Amount paid by E. Steadman for the use of the Company in North Carolina................................................................... $109,989 48
Amount paid by Company for boxing, hauling, etc., for the use of Company in North Carolina.............................. 9,696 45
Amount expended in repairing building here........................ 733 00

ESTIMATED LOSS BY THE FIRE.

| | | |
|---|---:|---:|
| 25 bales yarn, $2,000 00........................................ | $50,000 00 | |
| 1000 pounds cotton, $1 00................................. | 1,000 00 | |
| 2 pieces shipping, $37 50................................... | 75 00 | |
| 2½ dozen roller skins, $600 00............................ | 1,500 00 | |
| 2 gallons kerosene oil, $65 00............................ | 130 00 | |
| 5 gallons lard oil, $45 00.................................. | 225 00 | |
| 400 yards Osnaburgs, $350 00............................ | 1,400 00 | |
| Sole and upper leather.................................... | 450 00 | $54,780 00 |
| 2 bales yarn burned by the Yankees while in route for Augusta................................................ | 4,000 00 | |
| 1 barrel oil burnt on railroad........................... | 1,800 00 | |
| Dividend declared March 24th, 1865................ | 22,855 77 | $32,513 77 |
| | | $414,547 75 |

It appears that the earnings of the mills were, for the first 80 days, to October 31...................$210,694 05
The amount of dividends declared that, and for the last 74 days, from October 31st to January 26th, the time of the fire............................ 203,853 70
                                 —————$414,547 75

   (Signed)               W. F. KENNEDY, Manager.

11th. Receipts made by Charles Camp, per W. J. C., as follows, viz. :

" Received this day, of Hugh McLean, seven hundred and fifty dollars for rent, to be credited on note given to Charles Camp and Noah Phillips for lease of chair factory, wheel and shafting, and four dwelling houses, which pays rent to the first day of November, 1866, this the third day of November, 1866.

    (Signed)                    "CHARLES CAMP,
    [Stamp.]                     ("per W. J. C.")

" Received of Hugh McLean, by the hands of A. B. Simms, Esq., sixteen hundred and thirteen dollars and seventy-five cents (for the money due on lease notes made to Phillips & Camp,) principal and interest, for two years' lease, 1864 and 1865.

(Signed)                          " CHARLES CAMP,
[Stamp.]                          (" per W. J. C.")

### EVIDENCE FOR DEFENDANT.

A. B. Simms, Esq., sworn, said :

" I was employed by McLean to collect rent for this factory ; I collected about $2,400 00 from McLean for Charles Camp on the lease; I collected rent money for McLean and sent it to him by express to Augusta in 1866 or 1867 ; made collections for him at two different times ; I got acknowledgment from McLean for the remittance made by me; I collected plantation rent also for McLean, and sent it by express, after collecting the rent on lease of the factory the first time ; I am still collecting plantation rent for him ; I think I was collecting plantation rent at the second time I collected rent for him on this factory property ; identified two express receipts, as they were given to me for the money which I had collected on account of rent for McLean (rent of the Alguadon Factory property) ; identified the papers shown as McLean's acknowledgment of said money sent ; I wrote the letter shown me by Judge Floyd ; I collected the money for Charles Camp out of McLean by distress warrant; when I was pressing Steadman for McLean, Steadman made a proposition as to the condition upon which he (Steadman) would pay the rent ; I communicated that proposition to McLean."

Counsel for complainant asked the witness, A. B. Simms, to state that proposition. Counsel for defendants objected on the ground that the proposition made by Steadman, through Simms, the witness, was made in professional confidence. A. B. Simms, the witness, stated that at the time Steadman made this proposition he was not an attorney for Steadman in any

case, but that Steadman stated, that if McLean accepted his proposition that he (Simms) should be employed in the case; the negotiations on that proposition were continued for some time, but the proposition was never acted on.

The proposition made by Steadman to McLean, and which McLean sought to prove by Simms, was to the following effect, viz.: Steadman proposed, through Simms, to McLean, in 1867, before this present suit was commenced, that if Mc-Lean would commence this present suit against William W. Clark alone, and leave him out, that he (Steadman) would pay all lawyer's fees and other expenses of that suit, and pay back to McLean the money which he (McLean) had been forced to pay to Charles Camp on the lease notes, provided McLean, in writing, would obligate himself to give to him (Steadman) one-half of whatever amount might be recovered from Mr. Clark in such suit, and that he (Steadman) was not to be known in said suit so far as he might take an interest under that proposition.

The Court sustained the objection made by counsel for defendant, and refused to permit the testimony to go to the jury, or to permit counsel for complainant to state, in presence of the jury, what propositions by Steadman to McLean, through Simms, he expected to prove. Counsel for complainant then and there excepted to the said rulings and judgment of the Court, and now here assigns the same as error.

Defendants introduced the following copy papers, which were identified by Mr. Simms, viz.:

"$937 50.          "COVINGTON, November 20th, 1866.

"Recived from A. B. Simms one letter, sealed, and said to contain $937 50, addressed to Hugh McLean, Augusta, Ga.

(Signed)          "J. J. SPENCER,

"For the Company."

"AUGUSTA, January 27th, 1867.

"A. B. SIMMS, ESQ.:

"*Dear Sir*—I have now got home from Memphis. Your letter is now before me, containing an order on Heard & Clay,

McLean *vs.* Clark *et al.*

for the sum of $357 50, and a $100 00 bill.   I am satisfied with your management of my business.

"Yours truly,

(Signed)                    "HUGH MCLEAN." ·

Defendants then offered in evidence a note, of which the following is a copy:

"Thirty days after date, I, *we*, promise to pay Hugh McLean or order, $66,530 00, for value received in currency, 27th July, 1864.

(Signed)              "WILLIAM W. CLARK,

"JOHN HARRIS."

Defendants introduced the following draft:

"$40,560 00.          "COVINGTON, August 19th, 1864.

"At sight pay Hugh McLean, or order, $40,560 00, in new issue, and charge to my account.

(Signed)              "E. STEADMAN."

Complainant introduced the following note, viz.:

"COVINGTON MILLS, July 22d, 1864.

"HUGH MCLEAN:

"*Dear Sir*—We see a flag on your factory.   If it is a Confederate flag, all right.   If otherwise, it must be hauled down at once, or it will be taken down in short order.

(Signed)         "W. F. KENNEDY, and others,

"Of Covington Mills."

The evidence introduced for complainant, and defendants was voluminous, and only so much is here set forth as is necessary to an understanding of the decision of the Court.

Counsel for complainant in writing, requested the Court to charge as follows, viz.:

1st.  "That when a bill waives discovery, the answer of defendant is not evidence for him.   He is bound to prove the allegations in his answer, or they amount to nothing more than pleadings at law.   But if complainant chooses to use the

admissions in the answer, he has a right to do so, and the defendant is bound by them.

2d. "That if it be shown that, at the time of this trade with McLean, the defendants, Harris and Steadman, were to be interested jointly, as a company, or copartners therein, they are with Clark, jointly and severally liable, and the answer of either, when put' in evidence by complainant, is good as evidence against all.

3d. "If the evidence in this case shows that McLean sold against his own free will, under impressions of fear, superinduced by Clark, the law declares the sale fraudulent and void, at the instance of McLean.

4th. "If you find the contract of sale to have been made on the part of McLean, under such circumstances as to destroy his liberty of will, whether those circumstances were superinduced by Clark, or not, yet, if Clark knew that was the state of his (McLean's) mind, and still consummated the trade with him, while in that condition, the sale was void as to Clark, and those interested with him in the purchase.

5th. "If the evidence shows that Clark bought, in pursuance of a previous understanding, with Steadman and Harris, that they were to be jointly interested with him in the purchase from McLean, of his leasehold, his machinery in the factory, and thirty bales of cotton, and the trade, has been shown to be void as to Clark, it is also void as to Steadman and Harris.

6th. "If the evidence shows McLean was excited and alarmed about his personal safety, or the safety of his property, because of actual or supposed indignation against him in the community at the time, and he sent for Clark to counsel him and Clark took advantage of this state of his mind and feelings and bought his property at a price far below its true value, the purchase was void and may be set aside at the instance of McLean, and more especially is this true, if you find that Clark had just a short time before been employed and consulted by McLean as his attorney-at-law.

7th. "If you find the sum agreed on as the price for the

machinery, the cotton, and the lease, is not truly stated in the deed, this, of itself, is a badge of fraud, and if the transaction be shown to have been between the attorney and his client, McLean, the deed is void absolutely, and McLean may recover all the damages done by the wrong.

8th. "A transfer made by a client for an ostensibly valuable consideration, is presumptively void, and the attorney must show that it was fair, and that the terms were as good as could have been obtained from a stranger.

9th. "That inadequacy of price, in connection with suspicious circumstances, is evidence of fraud, particularly in view of the relations of the parties.

10th. "The party receiving the benefit of a deed, procured by the duress of a stranger, cannot take advantage of it, whether he was a party to the duress or not.

11th. "If you find the sale to Clark and his co-defendants was void, under the facts and the law applicable thereto, you should find and decree that McLean recover from the said defendants the amount of the value of said lease-hold, and also of the machinery in the factory, and the thirty bales of cotton, at such value as you shall find they were proved to have had at any time, from the date of the sale down to the present time, with interest thereon.

12th. "Before it can be claimed that McLean has ratified or acquiesced in the sale to these defendants, it must be shown, by clear proof, that the proposition of acquiescence was distinctly brought before him, and that he, upon full notice of the fact, did so acquiesce, and the burden of proving this is upon the defendants. If they fail to prove that McLean did, in express terms, or by some act which he intended should be so understood, clearly acquiesce in said sale, they fall short of the requirements of the law, and this branch of their defense wholly fails."

After argument had on both sides, the Court read to the jury a written charge, of which the following is a copy:

"This is a bill filed by the complainant, Hugh McLean, against William W. Clark, John Harris and Enoch Stead-

man to set aside and avoid a contract of sale, upon the ground of fraud and duress, alleged in his said bill to have been made with said defendants on 27th of July, 1864, for the Alguadon Manufactory, machinery, appurtenances, water privileges, etc.; more particularly set forth and described in his said bill—situated, lying and being in said county, and thirty bales of cotton, and to recover the amount of the value of said machinery and cotton, with the lawful interest thereon, minus the sum paid to complainant by defendants, at its actual value, in good money, and to restrain the prosecution of a suit pending in Richmond county, Georgia, in favor of Enoch Steadman co-defendant, against complainant, McLean, for rent of lease from Phillips & Camp, and to recover the amount of rent paid by complainant on said lease since the said contract of sale to defendants. The Court repeats that the complainant proposes to have said sale set aside and avoided, upon the ground of fraud and duress, and to recover as prayed for in the bill.

"The Court will not undertake to repeat the allegations in the bill and answers of each of the defendants, but directs you to read them clearly and carefully, that you may more clearly understand the true issues between the parties and the law as will be given you in charge by the Court. The complainant, in his bill, has waived discovery from any of the defendants, and, therefore, no part of the answer of defendants is evidence for them, or either of them, but any admission admitted in the answer of either of the defendants is evidence for the complainant. The allegations in the bill are not evidence unless admitted in the defendants' answer, or either of them, or sustained by proof.

The answer of one defendant is evidence for another whenever it states facts against his own interest, and in favor of his co-defendants: Code, section 3052. According to the rules of law as will be given you in charge, all the parties are responsible to innocent third persons, for damages arising from fraud of one partner in matters relating to the partnership. A partnership may be created either by written or parol contract, or it

McLean *vs.* Clark *et al.*

may arise from joint ownership, use or enjoyment of the profits of undivided property, real or personal; if nc time is specified it commences immediately. The Court charges you, that if you believe that there was an agreement and contract between Clark and Harris, and Steadman, upon the condition that he could purchase the property in dispute, at a certain price, and that they would then become joint owners and partners, the liability of the partnership *did not commence until the trade was consummated, and the parties all agreed and consented to the terms of the contract, and went into possession, and from that time the partnership became liable for damages arising from fraud of one partner in matters relating to the partnership. The Court, therefore, charges you, that unless Harris and Steadman were notified of the duress and fraud, alleged to have been perpetrated by Clark, in negotiating for the property to become partnership property, or in which they were to become joint owners, upon the condition of the partnership, and upon the terms, and at the price stipulated, they are not liable for the fraud of Clark; if they were so notified, and accepted it, they are liable.* The Court charges you, that if you believe, from the evidence, that the defendants combined and conspired together to defraud and cheat the complainant out of his property, before the contract of sale, or at the time of the sale, then all are equally liable. If you believe, from the evidence, that fraud and duress has been established, these elements are essential to a contract and sale. First, an identification of the thing sold. Second, an agreement as to the price to be paid. Third, consent of the parties. The property may be identified by the allegations in the bill, and admissions of the answers of defendants taken together, or by other proof. A consideration is essential to a contract, which the law will enforce; an executory contract without such consideration is called a *nudum pactum*, or naked promise: section 2697, Code. A consideration is valid if any benefit occurs to him who makes the promise, or any injury to him who receives the promise: section 2698, Code. A valuable consideration is essential to a sale; it must either be defi-

nite or an agreement made by which it can be made certain; if its ascertainment becomes impossible there is no sale: section 2604, Code. Inadequacy of price is no ground for rescission of a contract of sale, unless it is so gross as combined with other circumstances to amount to a fraud: Code, 2605. Mere inadequacy of consideration alone will not void a sale; if the inadequacy be great it is a strong circumstance to evidence fraud: section 2700, Code. The free assent of the parties being essential to a valid contract, duress of either imprisonment, or by threats or other acts by which the free will of the party is restrained, and his consent induced will void the contract: Code, section 2710. Fraud voids all contracts of sale. Fraud may not be presumed but being subtle in itself, slight circumstances may be sufficient to carry conviction of its existence: section 2709, Code. Fraud may exist from misrepresentations of either party made with a design to deceive, or which does actually deceive the other party, and in the latter case such misrepresentations voids the sale, though the party making them was not aware that his statements were false. Such misrepresentations may be perpetrated by acts, as well as words, and by artifice designed to mislead. A misrepresentation not acted on is not a ground for avoiding a contract. Duress consists in any illegal imprisonment, or legal imprisonment, used for an illegal purpose, or threats of bodily harm, or other means amounting to or tending to coerce the will of another, and actually inducing him to do an act contrary to his free will; therefore, to make a contract of sale good and binding, it must be the result of the free and independent volition of the parties to the contract, and unrestrained and free from all fraud. Fraud may be actual or constructive. Actual fraud consists in any act of omission or commission, contrary to legal or equitable duty, trust or confidence justly reposed, which is contrary to good conscience, and operates to the injury of another. The former implies moral guilt. The latter may be consistent with innocence. Misrepresentation of a material fact, made willfully to deceive, or recklessly, without knowledge, and acted on by the opposite party, or if made

by mistake, and innocently acted on by the opposite party, constitutes legal fraud. Suppression of a fact material to be known, and which the party is under obligations to communicate, may arise from the confidential relations of the parties, or from the particular circumstances of the case.

Fraud may be consummated by signs or tricks, or through agents employed to deceive, or in any other unfair way used to cheat another. Any relations shall be deemed confidential arising from nature or created by law, or resulting from contracts, when one party is so situated as to exercise a controling influence over the will, conduct or contract of another, or where, from similar relations of mutual confidence, the law requires the utmost good faith; such as partners, principal and agent, etc.; great inadequacy of consideration, joined with great disparity of mental ability in contracting a bargain, may justify a Court of equity in setting aside a sale or contract. Anything which happens without the agency or fault of the party affected, tending to disturb and confuse the judgment, or to mislead, and of which the opposite party takes an undue advantage, is, in equity, a surprise, and one species of fraud for which relief is granted.

The complainant, Hugh McLean, alleges in his bill that William W. Clark, one of the defendants, came to him and said there had been a public meeting of the citizens of the town of Covington at the Court-house, and that the result was that they had threatened to take his (Hugh McLean's) life, unless he would leave the country; that he (William W. Clark) had come to him as a friend and Mason, on the square, to warn him of his danger and advise him for the best, and urged him to sell the factory, including thirty bales of cotton, which said Hugh McLean had on hand at the time, and that he, under the influence of fears thus aroused, consented to take sixty thousand dollars for said factory, machinery and cotton, greatly less than its value. Now, if you believe, from the evidence, that the allegations just repeated in the charge, and taken from the bill of complaint, are sustained by the proof, that the said sale was induced by the said William W. Clark making

said representations charged in said bill, under the influence
of fears of bodily harm or injury to person or property, and
actually induced him to make said sale of his property, con-
trary to his free will and consent, and was the act and will
of the said William W. Clark, the sale should be held fraud-
ulent, and complainant is entitled to recover the value of the
property on the day of the sale, less the amount paid in good
money, with interest thereon according to the evidence.    If,
on the other hand, you should believe, from the evidence,
that the said allegations are not sustained, and that said charge
of duress and fraud in complainant's bill has been overcome,
you should find for defendant.    The Court charges you, that
if you believe, from the evidence, that there existed confidential
relations, as client and attorney, between McLean and Clark,
and that they existed and continued up to the day of the sale,
it is incumbent upon Clark to show, by clear and satisfactory
proof, that the transaction was fair and legal.    The Court
charges you, that if you believe from the evidence, that com-
plainant, McLean, of his own free will and accord, sold said
property to defendant, Clark, for less than its value, in conse-
quence of the liability of such kind of property to destruction ;
if you believe, from the evidence, that such property was liable
to be destroyed, you should not disturb the transaction.    The
Court charges you that, in looking into and estimating the
fairness of the price paid for said property, you have the right
to take into consideration its value in the light of surround-
ing circumstances, at the time of the sale, calculated to depre-
ciate its value ; for instance, that there was a war going on
between the North and South, and that the Federal army was
approaching, making raids with cavalry through the country
burning such property.    The Court charges you, also, that if
you believe that W. W. Clark knew that McLean was alarmed,
frightened and overwhelmed with difficulties and troubles, and
fraudulently took advantage of him *in this state of mind*, and
bought his property for greatly less than its value at the time
of the sale, the sale would be fraudulent, although he may not
have brought about that condition of mind; but you should be

McLean *vs.* Clark *et al.*

satisfied, from the evidence, as developed during the trial *from the stand*, that he was truly in the state of mind alleged in his said bill. If you believe, from the evidence, that complainant became alarmed and frightened by reason of the presence or proximity of the Federal army, and sold his property to defendants to save it from destruction by the enemy, for greatly less than its value, and that said defendants did not take advantage of complainant's state of alarm at the time to buy it for greatly less than its value, you should find for defendants.

The Court charges you that a witness who has sworn falsely on one point may not be believed—"*falsus in uno, falsus in omnibus*"—"false in one thing, false in all," and it is with the jury to say whether you will believe such a witness or not. The presumption of the law is that if a witness is proven to have sworn false in one particular that he has sworn false in all. But you should be satisfied first that a witness has been shown to have sworn falsely to one particular. You should look to the evidence to ascertain; a witness who has been contradicted is not to be believed in preference to one who has not been so contradicted. A witness who testifies clearly and consistently, in a straightforward way, is to be believed in preference to one who testifies contradictorily, hesitatingly and confusedly. You may look to the manner and deportment of a witness in Court, and to all the facts and surroundings of the case as shown by the evidence.

The Court charges you, that it is your duty to reconcile the testimony; if you can, without lightly imputing perjury to any one. If you cannot, then you should, after weighing all the facts and circumstances as was disclosed on the trial, find in favor of that which preponderates, however slight. When one witness testifies to a fact positively, and another, equally respectable and credible, and with the same means of knowledge, denies the fact affirmatively stated, you must leave the parties where you find them. If complainant testified to one fact and defendant denies it, unless complainant introduces testimony in support of his side, you should find for defendants;

but if complainant sustains his statements by proof which preponderates, however slightly, you should find for complainant. If complainant testified that the relationship of client and attorney existed between him and Clark, and Clark denies it, or that it existed once but had terminated, then it would be necessary for complainant to support his declaration, and if he did, the weight of evidence would preponderate in favor of complainant. The Court charges you, that if you believe from the evidence, that the contract was induced by and through the fraud and duress created by Clark, and afterwards was ratified and acquiesced in fully and voluntarily, subsequent to the time of making the contract, he is bound by said ratification, unless he did so being ignorant of his rights. Acquiescence goes for nothing, so long as a man continues in the same situation in which he was at the date of the transaction, but as soon as a man, with full knowledge of his rights, or at least with sufficient notice or means of knowing his rights, and all the material circumstances of the case, freely and advisedly does anything which amounts to the recognition of a transaction, or acts in a manner inconsistent with repudiation, and knowingly and deliberately permits another to incur expense under the belief that the transaction has been recognized, or freely and advisedly abstains, for a considerable lapse of time, from impeaching, there is acquiescence, and although originally impeachable, becomes unimpeachable in equity. Now, if you believe, from the evidence, that McLean, with a knowledge of his rights, and all the material circumstances of the case, and advisedly collected rent from the lease, which, if he did, was inconsistent with repudiation of the contract, or has, for a considerable time, and knowingly and deliberately permitted another to deal with the property, or to incur expense under the belief that the trade with defendants (if a trade was made,) was right, and recognized, and freely and advisedly abstained, for a considerable lapse of time, from impeaching it, there is acquiescence, and the sale, although originally not fair and legal, and might have been impeached, becomes unimpeachable in equity.

McLean *vs.* Clark *et al.*

"Now, in conclusion, gentlemen, to find the facts is exclusively for you, and to weigh them. If you come to the conclusion to find for the complainant, after due consideration of the evidence, under the rules of law as given you in charge by the Court and said requests of the counsel for complainant and defendants, as it may seem proper and legal to give, the first question is to determine if all are liable. If not, who of them are? You may find against all, if the evidence, under the law, given you in charge, will allow; if not, you may find against two, or you may find against one, only, if you determine to find a verdict for the complainant. The next is, the nature and amount of your verdict. It seems to be admitted by all parties that the property cannot be returned. The complainant having filed his bill for the amount of the value of the property sold, charged in said bill, minus or less the amount of money paid in good money, and interest thereon, and to restrain the said Enoch Steadman from further prosecuting a suit now pending in Richmond county, Georgia, against said complainant, the amount of your verdict must be governed by the proven value of the property, whatever that may be. But if you should come to the conclusion to find for the defendants, you should simply return a verdict, 'We, the jury, find for defendants and cost of suit.' As you believe, so find."

The jury retired, and after a consultation for about the space of two hours, (from 8 to 10 o'clock, P. M.,) on the night of Saturday, the 23d day of March, 1872, returned and handed the bill and other papers to counsel for complainant, who moved the Court to poll the jury, each juror answering for himself. Two of these said the verdict was not theirs, but they had agreed that a majority should govern. Counsel for complainant moved the Court to enter a mistrial, which the Court refused to do, and sent the jury back to their room with instructions to agree. In about thirty minutes the jury returned, and, on being again polled, each juror said that he had agreed to the verdict, which was for the defendants.

The complainant moved for a new trial, upon the following grounds, to-wit:

1st. Because the Court erred in rejecting and refusing to permit counsel for complainant to read in evidence to the jury the following portions of the answer of complainant to the third direct interrogatory, viz. : " I had learned, from inquiry, that there had been no meeting of the citizens, but that the whole story was a *ruse* to get my property. I accordingly stated this to Mr. Barr and others about the factory, and that I would not surrender the possession."

2d. Because the Court erred in rejecting and refusing to permit counsel for complainant to read in evidence to the jury the following portions of the answer of Hugh McLean to the seventh direct interrogatory, viz. : " I do believe, from the facts detailed in my answer to the third direct interrogatory, that a conspiracy existed to obtain my property."

3d. Because the Court erred. in rejecting and refusing to permit counsel for complainant to read ·in evidence to the jury the following portions of the answer of Hugh McLean to the seventh direct interrogatory, viz. : " I also believe that the object Clark had in view, when making the false reports he did, was to drive me from the county, and probably from the country, in order that the forced sale might not be disturbed."

4th. Because the Court erred in rejecting and refusing to permit counsel for complainant to read in evidence to the jury the following portions of the answer of James Hope to the fourth direct interrogatory, viz. : " I can only answer this interrogatory by making the following statement : During the year 1864, myself, in company with three others, determined to buy the machinery of this factory, if McLean would sell, and in conversation in reference to the purchase, my friends desired me to confer with McLean in reference to the purchase, and offer him $20,000 00 in American gold coin, and authorized me not to fail to make the purchase by a small difference over our offer."

5th. Because the Court erred in rejecting and refusing to permit counsel for complainant to read in evidence to the jury the following portions of the answer of the said James

McLean *vs.* Clark *et al.*

Hope to the third cross-interrogatory, viz.: " In answer to the fourth direct interrogatory, I stated what my knowledge and opinion was in reference to its value, and am satisfied that if we had succeeded in making the puchase at even $25,000 00 in gold, we would have made a fortune out of it.   I had seen a list of the machinery and their capacity, and from my knowledge of machinery and its value, was enabled to place a fair valuation upon it, and one of the parties making the offer, a practical manufacturer, had seen it and understood fully its value.   I never saw it myself.   I know of no change in the value or condition of the machinery at the date of our offer and the date of its sale.   I have no positive knowledge, as before stated, of the circumstances attending the sale."

6th.  Because the Court erred in rejecting and refusing to permit counsel for complainant to read in evidence the following portions of the answer of Adam Johnson to the third direct interrogatory, viz.: " In 1864, I authorized Mr. James Hope to purchase this machinery, if possible, at $20,000 00 in specie, a party of four desiring to purchase it.   The $20,000 00 in specie was agreed between us as a *minimum* valuation.   He was authorized to give more if necessary to a trade.   I know nothing more than above stated in the premises inquired of."

7th.  Because the Court erred in rejecting and refusing to permit counsel for complainant to read in evidence to the jury the following parts or portions of the answer of George Dobson to the third direct interrogatory, viz.: " The sale, in all its features, was a compulsory one, and effected through the misrepresentations of his legal adviser, Mr. Clark, who negotiated the whole transaction.   The sale was not of his own free will and accord."

8th.  Because the Court erred in rejecting and refusing to permit counsel for complainant to read in evidence to the jury the following portions of the answer of the said George Dobson to the sixth direct interrogatory, viz.: " Clark came to McLean several times, and on each occasion *tried and succeeded in impressing McLean with the belief that his safety*

*could only be secured by relinquishing his interest in the factory and leaving Newton county."*

9th. Because the Court erred in rejecting and refusing to permit counsel for complainant to read in evidence to the jury the following words, contained in the answer of the said George Dobson to the seventh direct interrogatory, viz.: "The impression on my mind at the time was, and still is, that McLean would certainly not have sold the property if he had not then believed that his own life, and the lives of his family, were in danger, and that this belief was caused by the persistent representations of Clark."

10th. Because the Court erred in rejecting and refusing to permit counsel for complainant to read, in evidence to the jury, that part of the answer of the said George Dobson, to the third cross-interrogatory, as herein set forth underscored, viz.: "*McLean raised* a flag after the raid had reached Covington, and was momentarily expected at the river, and, in fact, after Kitchens, the Confederate Provost Marshal, and several others, had galloped across the bridge, which they attempted to destroy by fire, '*I suggested to McLean that he could probably secure himself by claiming protection as a British subject; McLean's daughter, Mrs. Foule, remarked that she had a small flag, which she had brought from Augusta; it was the British Union Jack; as soon as it was put up a party came from Steadman's Mills, and said to Mr. McLean, that unless that flag was immediately taken down, they would destroy the mills, and that he should claim no immunity, which they did not possess.'*"

11th. Because the Court erred in rejecting and refusing to permit counsel for complainant to read, in evidence to the jury, the following portions of the answer of the said George Dobson, to the sixth cross-interrogatory, viz.: "The property was not sold because of any danger surrounding it, but because McLean was fraudulently led by Clark to believe that his (McLean's) life would be endangered by his retention of the property."

12th. Because the Court erred in rejecting and refusing to

McLean *vs.* Clark *et al.*

permit counsel for complainant to read, in evidence to the jury, those portions of the answer of John W. Barr, to the third direct interrogatory, herein set forth: "McLean is not now in possession of the said factory; during the year 1864, I believe during the first raid of the Federal troops east of Atlanta, and in the direction of Covington, Mr. McLean, at the suggestion of some friend, raised a British flag over, or in front of the factory, as a means of protecting it from the aforesaid troops, believing the same to be of great value to the people of the country at that time; on the following Monday, Mr. Clark came out to Mr. McLean's house and had some conversation with complainant, who (*complainant*) *immediately came down to the factory and told us that Mr. Clark had informed him that the citizens of the town had held a meeting, and determined to hang him for raising the British flag on his factory, and to leave the place to save his life.*"

13th. Because the Court erred in refusing to permit the counsel for complainant to prove, by A. B. Simms, the declarations of Enoch Steadman, (one of the defendants) to-wit: "That in 1867, before the present suit was commenced, Enoch Steadman said that he would be a good witness for McLean, in a suit by McLean against William W. Clark, to set aside the sale of his factory property, and that if McLean would sue Clark, and agree to give him, Steadman, one-half the amount that might be recovered in said suit; that he (Steadman) would pay back to McLean the amount of money that McLean had been forced to pay to Camp on his, McLean's, lease notes, since the sale."

14th. Because the Court erred in refusing to charge, as requested in writing by counsel for complainant, that "if it be shown that at the time of the trade with McLean, the defendants, Harris and Steadman, were to be interested, jointly as a company or copartners therein, they are with Clark, jointly and severally liable, and the answer of one, and the answer of either, when put in evidence (by complainant) is good as evidence against all," and instead thereof charged the jury as follows: "The Court charges you that if you believe, from the

evidence, that there was an agreement and contract between Clark, Harris and Steadman, upon the condition that he could purchase the property in dispute at a certain price, and that they would then become part owners and partners, the *liability* of *the* partnership *did not* commence until the trade was consumated, and all the parties agreed and consented to the terms of the contract, and went into póssession. *From that time* the partnership became liable for damages arising from fraud of one partner in matters relating to the partnership. The Court, therefore, charges you that unless Harris and Steadman were notified of the duress and fraud alleged to have been perpetrated by Clark, in negotiating for the property to become partnership property, or in which they were to become joint owners, upon the conditions of the purchase, and upòn the terms and at the price stipulated, they are not liable for the fraud of Clark; if they were so notified and adopted it they are liable."

15th. Because the Court erred in the manner in which it gave, in charge to the jury, as requested by counsel for complainant, request number three, as follows, to-wit: "If the evidence in this case shows that McLean sold against his own free will, under impressions of fear, superinduced by Clark, the law declares the sale fraudulent and void, at the instance of McLean." Upon that request, the Court charged as follows, to-wit: "That complainant, Hugh McLean, alleges in his bill that William W. Clark, one of the defendants, came to him and said there had been a public meeting of the citizens of the town of Covington, at the Court-house, and that the result was that they had determined to take his (Hugh McLean's) life, unless he would leave the country; that he (W. W. Clark) had come to him as a man and Mason, on the square, to warn him of his danger and advise him for the best, and urged him to sell the property, including a lot of thirty bales of cotton which said Hugh McLean had on hand at the time, and that he, under the influence of fears thus aroused, consented to take $60,000 00 for said factory, machinery and cotton—greatly less than its value. Now, if you believe from the evidence that

the allegations just repeated in the charge, and taken from the bill of complaint, are sustained by proof that the said sale was induced by the said William W. Clark making said representations charged in said bill, under the influence of fears of bodily harm or injury to person or property, and actually induced him to make the said sale of said property, and, contrary to his free will and consent, and was the act and will of the said William W. Clark, the sale should be held as fraudulent, and complainant is entitled to recover the value of the property on the day of sale, less the amount paid in good money, with interest thereon, according to the evidence."

16th. Because the Court erred in refusing to charge as requested, in writing, by counsel for complainant, as follows, viz.: "If you find the contract of sale to have been made, on the part of McLean, under such circumstances as to destroy his liberty of will, whether those circumstances were superinduced by Clark or not, yet if Clark knew that was the state of his mind and still consummated the trade with him in that condition, it was void as to Clark and those interested with him in the purchase." And, instead thereof, charging the jury in direct connection with that part of the charge repeated in the last ground of error in this motion, as follows, viz.: "If, on the other hand, you should believe from the evidence that the said allegations are not sustained, and that the said charge of duress and fraud in complainant's bill is not sustained, and that said charge of duress and fraud in complainant's bill has been overcome, you should find for the defendants."

17th. Because the Court erred in refusing and failing to charge the jury as requested, viz.: "If the evidence shows that Clark bought in pursuance of a previous understanding with Steadman and Harris, that they were to be jointly interested with him in the purchase from McLean of his leasehold, his machinery in the factory and thirty bales of cotton, and the trade is shown to be void as to Clark, it is also void as to Steadman and Harris."

18th. Because the Court refused and failed to charge the jury "that if the evidence shows McLean was excited and alarmed

about his personal safety, or the safety of his property, because of actual or supposed indignation against him in the community, at the time, and he sent for Clark to counsel him, and Clark took advantage of this state of his mind and feelings, and bought his property, the purchase is void, and may be set aside at the instance of McLean; and more especially is this true if you find that Clark had, just a short time before, been employed and counseled by said McLean, as his attorney at law," and instead thereof charging as follows: "The Court charges you that if you believe, from the evidence, that there existed confidential relations as client and attorney between McLean and Clark, and that they existed and continued up to the day of sale, it is incumbent on Clark to show by clear and satisfactory proof that the transaction was fair and legal."

19th. Because the Court erred in refusing to charge the jury as requested, viz.: "If you find the sum agreed on as the price for the machinery, the cotton and lease, is not truly stated in the deed to Clark, this of itself is a badge of fraud, and if the transaction be shown to have been between the attorney and his client, McLean, the deed is void absolutely, and McLean may recover all the damages done by the wrong."

20th. Because the Court erred in refusing to charge, "that a transfer made by a client for an ostensibly valuable consideration, is presumptively void, and the attorney must show that it was fair, and that the terms were as good as could have been obtained from a stranger."

21st. Because the Court erred in refusing to charge the jury as requested, viz.: "The parties receiving the benefit of a deed procured by the duress of a stranger cannot take advantage of it whether he was a party to the duress or not."

22d. Because the Court erred in refusing to charge, viz.: "If you find this sale to Clark, and his co-defendants was void under the facts and the law applicable thereto, you should find and decree that McLean recover from said defendants the amount of the value of said leasehold, and also the said machinery in the factory, and the thirty bales of cotton at such value as

you shall find they were proved to have had at any time from date of sale to the present time, with interest thereon."

23d. Because the Court erred in refusing to charge the jury "that before it can be claimed that McLean ratified or acquiesced in the sale to these defendants, it must be shown by clear proof that the proposition of acquiescence was distinctly brought before him, and he, upon full notice of the facts, did so acquiesce, and the burden of proving this is upon the defendants. If they fail to prove that McLean, (in express terms, or by some act which he intended should be so understood) clearly acquiesced in said sale, they fall short of the requirements of the law, and this branch of their defense wholly fails." And, also, in charging as he did on that branch of this case.

24th. Because the Court erred in charging the jury as follows, viz.: "The Court charges you that if you believe, from the evidence, that McLean, of his own free will and accord, sold said property to defendant, Clark, for less than its value, in consequence of the liability of such kind of property to destruction; *if you believe, from the evidence, that such property was liable to be destroyed, you should not disturb the transaction.* The Court charges you that in looking into and estimating the fairness of the price paid for said property, you have the right to take into consideration its value in the light of surrounding circumstances at the time of sale, calculated to depreciate it; if you believe, from the evidence, that there were surrounding circumstances calculated to depreciate its value; for instance, if you believe it is established by evidence that there was a war going on between the North and South, and that the Federal army was approaching, making raids with cavalry through the country, burning such property."

25th. Because the Court erred in charging the jury as follows : "The Court charges you, also, that if you believe that W. W. Clark knew that McLean was alarmed, frightened and overwhelmed with difficulties and troubles, and fraudulently took advantage of him *in this state* of mind, and bought his property for greatly less than its value at the time of the sale, the sale would be fraudulent, although he might not have

brought about that state of mind, but you should be satisfied, from all the evidence as *developed during the trial from the stand,* that he was truly in the state of mind as alleged in his said bill." •

26th. Because the Court erred in charging the jury as follows, viz.: "The Court charges you that a witness who has sworn falsely on one point may not be believed—'*falsus in uno, falsus in omnibus,*' ('false in one thing, false in all,')—and it is with the jury to say whether they will believe such a witness or not. The presumption of the law is, that if a witness is proven to have sworn false in one particular, that he has sworn false in all; but you should be satisfied, first, that a witness has been proven to have sworn falsely in one particular; you should look to the evidence to ascertain. A witness who has been contradicted is not to be believed in preference to one who has not been so contradicted."

27th. Because the Court erred in charging the jury as follows, viz.: "Where a witness testifies to a fact positively, and another, equally respectable and creditable, with same means of knowledge, denies the fact affirmatively stated, you must leave the parties where you found them."

28th. Because the Court erred in his charge as to ratification or acquiescence, and as to the measure of damages.

29th. Because the charge is vague, and calculated to mislead the jury.

30th. Because the verdict was the verdict of only a majority of the jury.

31st. Because the verdict does not specify upon what defense it was based.

32d. Because the verdict is contrary to law and without evidence to support.

The motion for a new trial was overruled by the Court, The decision states that several of the alleged refusals to charge were given as requested. To which ruling complainant excepted, upon each of the aforesaid grounds, and now assigns the same as error.

J. S. Hook; John J. Floyd, for plaintiff in error.

Clark & Pace; A. M. Speer; Peeples & Howell, for defendants.

McCay, Judge.

1. The great issue on trial in this case was whether the defendants had, by unfair practices, so wrought on McLean's fears as to induce him, under the influence of those fears, to sell his property to them for much less than a fair price. This involves two things: Did they do the acts alleged? And if so, did these acts produce an alarm which led McLean to sacrifice his property? Did they take an unfair advantage of the surroundings, and of McLean's state of mind, to get his property from him at much less than its true value? Any evidence which is material to the illustration of either of these points is admissible. A witness who was present at the time of the transaction, and who testifies to the general statement that McLean was alarmed, did not act of his own free will, and that his legal adviser misrepresented the facts, (the legal adviser being one of the defendants and a partaker of the benefits of the fraud, if there was a fraud,) is, as it seems to us, giving " competent " testimony. True, he might, when questioned, go into greater detail, and it is in the power of the other side to push the inquiry into those details. The testimony, we find by this witness, goes into some of those details, and the other portions of what he says are to be considered in determining the weight to be given to the general statements. The witness states that he was present. He states that Clark negotiated the trade; that Clark was McLean's legal adviser; that he deceived McLean and put him in fear, so that he had no free will. He states, in other parts of his testimony, the character of the misrepresentations, etc. So far as this is a statement of facts, it is surely competent. That it does not sufficiently go into details; that it is general; that the witness states, as facts, which other parts of the testimony show he

was mistaken in, or did not know that these or like objections may be charged against it, are objections to its weight and not to its competency. Some of it is matter of opinion; but, so far as the state of McLean's mind was concerned, whether he was or was not alarmed, and the cause of his alarm, are, necessarily, matters of opinion; and, under the law, Code, section 3811, a witness may, in such matters, give his opinion, if he states the grounds of that opinion. The whole goes to the jury for what it is worth. If the grounds stated show that the circumstances were such as to justify the opinion, or if they show the contrary, the opinion has more or less weight with the jury.

2. It is always difficult to get at the state of the mind of another, and yet, in cases of this kind, this is of the utmost importance. There is hardly any other conceivable mode of getting at this than from the acts and words of the person at the time. Our Code, section 3720, lays down the rule on this subject thus: " Declarations accompanying an act, or so nearly connected therewith, in time, as to free them from all suspicion of device or after-thought, are admissible in evidence as part of the *res gestœ.*" And, again, section 3718 : " When, in a legal investigation, information, conversation, letters, replies, and similar evidence, are facts to explain conduct and ascertain motives, they are admitted as original, and not as hearsay evidence." We think the saying of McLean to the witness, immediately after the transactions, were, under these rules, admissible. What conceivable motive was there, just at that moment, to tell an untruth as to his motives? What suspicion of device or afterthought arises? Can it be supposed that, at that moment, he was looking to the repudiation of the contract? We think not. We think this statement is evidence, and fair, good evidence, to show the state of McLean's mind at the time. That, it must be remembered, is a distinct issue. Whether these defendants produced that state of mind, or how it arose, is another question.

As to all this evidence, which is mentioned in our first and second head-notes, whilst we hold it competent, we express no

McLean *vs.* Clark *et al.*

opinion upon its weight or credibility. That it was, and is, for the jury to pass upon, and in another trial, if there should be one, the jury have a right, and it is their sworn duty, to give it such weight, and such weight only, as their own good sense and conscience may dictate. The opinion we express of its competency is not to affect them in their judgment of its credibility or its weight.

3. We think the rule as to privileged communications to attorneys does not extend to a case like this. The attorney here was, at the time, attorney, not for the party making the communication, but the attorney of another, and by the very terms of the communication, it was to be proposed to the attorney, then to the client. Whilst the first relation existed, it was impossible for the attorney to enter into relations of any kind, inconsistent with his relation as attorney to his client; and if one, knowing this relation, sees fit to make communications to him, based on a future prospective employment, he does so at his peril, because the attorney at the time is the attorney of his then client, and he is bound to be true to him. This was not a privileged communication on principle, and as, by its very terms, it was to be communicated, we think it ought to have gone to the jury.

4. We cannot explain the discrepancy between the bill of exceptions, as signed by the Judge, and the reasons given by the Judge in his refusal to grant a new trial. These reasons are not part of the record; they need not to have been given, and they form no necessary part of the judgment. Ordinarily, the record may be used to correct the bill of exceptions: See Code, section 4223. But the reasons given by the Judge in his order overruling the motion for a new trial, can hardly rank with the bill of exceptions, which is a special certificate of the parol facts as they occurred at the trial.

5. When other persons are let into a trade, made, in form, in the name of another, but, in fact, on consultation with them, and in view of their joint interest, they stand on a different footing from purchasers, from the nominal vendee. This is only common sense. Neither equity nor good morals care

for the form in which parties see fit to clothe their transactions. If Clark, Harris and Steadman had consulted together and contemplated a joint purchase, and it was understood they should be jointly interested, and · Clark made the purchase, practicing a fraud in so doing, they all take the title tainted with the fraud. The actual purchaser is only the agent of the others. The subsequent arrangement is merely in pursuance of the first understanding. We do not say there was a fraud, but if there was, it would be a very dangerous doctrine to hold that, because they all did· not participate, the sale is good as to those who are not to blame. Clark was, in fact, the agent of all. Under the facts proven, it would have been gross bad faith on the part of Harris and Steadman to have refused to participate in Clark's purchase, if it was fair. In equity, therefore, he acted for all, for himself and as agent for the others.

6. We see no good objection to this mode of proving the value of the machinery. Certainly, what four or five men were willing to give for it is some evidence of its value. It may not be, and is not, conclusive. But value is always a matter of uncertainty, and an offer made, as the witness says, in good faith, and with intent to buy, is a tolerably safe mode of proving value. True, there might be special reasons why these men were willing to pay. extra, but on inquiries as to value, such difficulties attend almost any mode of proof.

·7. We think it was unfair to the plaintiff for the Judge to suggest to the jury, as he did in the charge, that McLean might have been influenced to sell by his knowledge that the factory was liable to be destroyed by the Federal army. There was no evidence that any such motive influenced McLean. So far as we find the facts, as set forth in the record, nothing upon this point appears, except in the charge of the Court. Doubtless the counsel may have pressed such a thought in argument to the jury, but it was not for the Court to press it home by his charge, since there was nothing in the evidence to justify it. The Judge should, on the contrary, if counsel

McLean *vs.* Clark *et al.*

did so argue, have warned the jury that they were to determine the case from the evidence.

8. In a bill of this kind, charging fraud and setting forth the details of it, we do not think it fair for the Judge to hold the jury to the *specific detail* of the facts in the bill to the letter. If any evidence is offered not coming fairly within the charges, it is the right and duty of the defendant to object; perhaps the complainant may wish to amend his bill, and if objections are made to testimony for want of proper charges, he will doubtless do so. If the evidence offered be not objected to, for want of proper allegations, and it go to the jury, we do not think the jury are not to consider it, because the particular specifications of the bill do not mention it. If it bears on the main issue, and has gone to the jury without objections, the jury may consider it, though it be not specified in the bill. In this view of the law we think, under the evidence, it was error for the Judge to state, as he did, the plaintiff's case, as stated in the bill, and then say, if these facts be proven you should find for the plainiiff, if not you should find for the defendant. The real issue was the fraud; the taking advantage of the fears of the complainant, and the agency of the defendants in getting up those fears for improper purposes. Anything which went to establish that issue, as claimed by the plaintiff, was, if before the jury as evidence, matter for their consideration, whether it was specifically set forth in the bill as one of the methods of the fraud or not.

9. We have not much faith in rules for *weighing* testimony. Very much of what is put forth as law on this subject is rather philosophy than law, and Judges, in giving such rules to the jury as law, should be very careful to keep within well settled rules. To justify disbelief in the testimony of a witness, because some portion of what he says is not true, it should always be remembered that the untruthfulness must be of some material matter; there are good reasons for this, in that men are not particular in statements, which are not material, but come in only as part of the *res gestæ;* they do not

remember such things accurately, and it seems absurd to charge a witness with wilfully telling falsehoods, immaterial to the issue in hand. We think the Judge erred in not qualifying his charge on this subject, so as to conform to the rule as we we have stated it.

10. We think, too, there was error in the charge as to the duty of the jury, when the plaintiff swears one way and the defendant another. In any case, and between any two witnesses, the jury may pass upon the credibility of the witnesses. The manner of the witness, the probability of the witness, his means of knowledge, etc., are all left out by the Judge in this rule. We think, too, the jury are clothed with a special power on this subject, under the Act of 1866, when the witnesses are parties; they may believe one and disbelieve the other; the strength of the interest of the witness becomes an element, and the character of the witness, as read in his face, and evidenced in his mode of swearing, and all the circumstances.

11. As we have said, we have not much faith in strict, unbending rules for weighing testimony. If there are any such rules, and we admit such rules do exist as law, they are only *general* rules, and are liable to be controlled by the facts and circumstances of each case. They are guides when the mind is otherwise at fault, and juries should not be held to them as rigid, unbending rules.

12. Perhaps the Judge merely made a slip of the tongue in giving, as he did, such undue prominence and weight to the oral evidence. It was, however, calculated to mislead the jury, and especially was it true, in this case, when most of the complainant's testimony was by interrogatories.

13. The very foundation of the complainant's bill is that he was frightened into this sale by his fear of violence from those who were enraged at him for hoisting some other than the Confederate flag. We do not think it fair for him to be charged with acquiesence from mere lapse of time, for failing, as long as he did, again to meet the anger of a community which he thought was so enraged. The events subsequent to

that time have not been such as to encourage a timid man to assert rights based on the charges of this bill. We know, too, that until 1868, our Courts were so situated towards the people and the United States as that men might well hesitate to resort to them. Even the Legislature and this Court have treated the statute of limitations suspended until 1868, and we think, in analogy to the law, equity would do the same thing.

14. The defense set up of waiver stands, to some extent, on the same principles as we have stated as to acquiescence. But we think it was due the plaintiff in this case that it should plainly appear he intended, by the receipt of this money, to waive his rights, or that he was, in fact, insisting on the contract. The evidence on this subject is not satisfactory. It does not clearly appear that he knew the source of this money. Waiver, in fact, is a matter of proof. Its very basis is intent, and unless the facts show knowledge, and are such as to make the inference of intent natural and free from doubt, the presumption of waiver from an act ought not to arise.

We think there ought to be a new trial. The charge of the Court and his rulings at the trial were such as to prevent a fair consideration of the plaintiff's case. We should not grant a new trial on the evidence alone; but the excluded evidence and the charge of the Judge may have affected the verdict, and we think a new trial ought to be had.

Judgment reversed.