## 25494. THACKER v. THE STATE.

Argued November 10, 1969—Decided February 13, 1970—
Rehearing denied March 5, 1970.

*John F. M. Ranitz, Jr., James E. Yates, III, Howard A. Mc-Glasson,* for appellant.

*Andrew J. Ryan, Jr., District Attorney, Robert E. Barker, Andrew J. Ryan, III, Tom Edenfield, Arthur K. Bolton, Attorney General, Harold N. Hill, Jr., Executive Assistant Attorney General, Marion O. Gordon, Assistant Attorney General, Larry H. Evans,* for appellee.

PER CURIAM. ■ Enumerated errors 1 and 2 are on the overruling of the defendant's motion to quash the indictment and his challenge to the array. It is contended, briefly, that *Code Ann. Title* 59 is unconstitutional because it excludes a large portion of persons from jury service without justification and permitted a racial imbalance on the county board of jury commissioners and a racial, sexual and age imbalance in the array of jurors in the present case.

(a) The fact that only one of the six members of the Chatham County Board of Jury Commissioners is a Negro, representing 17% of the board's membership, whereas 32% of the county population is Negro, makes neither the statute providing for the appointment of the commissioner (*Code Ann.* § 59-101) nor its application unconstitutional. The constitutionality of this statute was upheld as applied in the case of *Avery v. State,* 209 Ga. 116, 122 (1b) (70 SE2d 716), in which case there was not even one Negro commissioner on the board. Although this case was reversed by the U. S. Supreme Court (Avery v. Georgia, 345 U. S. 559 (73 SC 891, 97 LE 1244)), in neither that case nor in the subsequent case of Whitus v. Georgia, 385 U. S. 545 (87 SC 643, 17 LE2d 599), was the racial composition of the board even alluded to, much less disapproved.

(b) It is alleged that, whereas the population of Chatham County is 68% white and 32% Negro, the petit jury list was comprised of 87.7% white and 12.3% colored persons, the entire petit jury was 89.7% white and 10.3% colored and the panel of 48 jurors actually put upon the defendant was 99.6% white and .4% colored. These statistics, stipulated by both parties, indicate a disproportionate number of whites as compared to Negroes on the list of jurors, it is true. "However, proportion-

ate representation of the races is not necessary to guarantee equal protection of the law to the accused. *Heard v. State,* 210 Ga. 523 (81 SE2d 467); Swain v. Alabama, 380 U. S. 202 [85 SC 824, 13 LE2d 759] Akins v. Texas, 325 U. S. 398 (65 SC 1276, 89 LE 1692)." *Brookins v. State,* 221 Ga. 181, 187 (144 SE2d 83). What the Supreme Court disapproved, in such cases as Whitus v. Georgia, 385 U. S. 545, supra, was not the disproportionate representation of the races on the jury list per se, but the existence of the opportunity for discrimination, arising out of certain procedures there employed. The disproportion was viewed merely as evidence tending to support the suspicion of discrimination, which together comprised a prima facie case. The Supreme Court, in the Whitus case, supra, p. 552, recognized that the conclusion of discrimination from the disproportion was necessarily based upon mathematical probability, which necessarily resulted in some variance between the ratios of Negroes to whites on the jury lists and on the tax digest.

The primary objectionable procedure in the prior cases was the use, in the boxes from which jurors' names were drawn, of different colored tickets, which, along with the jury lists, were made up from the county tax digest, which had the letter (c) after the names of the Negroes and which, in turn, was made up from tax return sheets furnished by the State Revenue Department which were segregated according to race, either by the use of yellow and white sheets or separate listings, as was authorized by former *Code Ann.* §§ 92-6307, 92-6308. Both of the statutes were repealed by Ga. L. 1966, p. 393, thereby eliminating this basis for discrimination.

Furthermore, *Code Ann.* § 59-106 was revised by Ga. L. 1967, p. 251, so as to provide that the jury list should be compiled from the official registered voters' list which was used in the last preceding general election, rather than from the tax digest, as was previously provided.

All public officers are presumed to have discharged their sworn official duties. *Kirk v. State,* 73 Ga. 620 (3b); *Horne v. State,* 170 Ga. 638, 640 (153 SE 749); *Cornelious v. State,* 193 Ga. 25, 32 (17 SE2d 156); *Thompson v. State,* 203 Ga. 416, 418 (47 SE2d 54). Based on the record in this case we must assume that

the jury commissioners eliminated prospective jurors on the basis of their competency to serve, rather than because of racial discrimination.

(c) Nor do the facts that persons the defendant's age, twenty, are excluded from the jury list and that the ratio of females to males in the county is not maintained on the jury list make the statute or its application unconstitutional. In the case of Strauder v. West Virginia, 100 U. S. 303, 310 (25 LE 664), the court said: "We do not say that within the limits from which it is not excluded by the [14th] amendment, a State may not prescribe the qualifications of its jurors, and in so doing make discriminations. It may confine the selection to *males*, to freeholders, to citizens, to *persons within certain ages*, or to persons having educational qualifications. We do not believe the 14th Amendment was ever intended to prohibit this." (Emphasis supplied.)

(d) We have held above that the application of the statutes concerning the selection of the jury has not been shown to be unconstitutional. Title 59 of our Code is challenged as a whole, which attack must fail, since the statute is not invalid in every part for any reason alleged. *Williams v. Ragsdale*, 205 Ga. 274 (53 SE2d 339).

■ The defendant's motion for change of venue, on the ground of the unobtainability of an impartial jury, showed that there had been extensive radio, television and newspaper coverage of the events connected with the shooting of the police detective with whose murder the defendant was charged.

The key rulings on such motions in this type of case, as gleaned from *Morgan v. State*, 211 Ga. 172 (1) (84 SE2d 365) and cit., may be expressed thus: There is no inference of prejudice requiring a change of venue from the mere fact of the publishing of descriptive or even denunciatory matter, or even from the juror's having formed or expressed an opinion from rumor or from reports from newspapers or other news media; what is required is a showing that the juror had formed such a fixed or unchangeable opinion as to the guilt or innocence of the defendant as would not yield readily to the testimony. The record in the instant case indicates that, subsequent to the

making of the motion, the 48 prospective jurors were each qualified by asking them whether they had read, heard or seen the allegedly prejudicial reports and that all of them stated under oath that, even if they had, they had an open mind about it and were not prejudiced in any way. The publicity was not prejudicial per se. Even where the evidence is in substantial conflict, the trial judge does not abuse his discretion in overruling a motion for change of venue. *Chatterton v. State,* 221 Ga. 424, 429 (144 SE2d 726). The judge did not abuse his discretion in denying the change of venue under the circumstances in this case, as contended in enumerated error 3.

■ "Alleged prejudice or bias of a trial judge which is not based on an interest either pecuniary or relationship to a party within a prohibited degree (*Code Ann.* § 24-102) affords no legal ground of disqualification." *Jones v. State,* 219 Ga. 848 (1) (136 SE2d 358). Accordingly, the trial judge did not err in refusing, upon motion of defendant's counsel, to disqualify himself because he had participated, merely as a speaker, in a civic club meeting at which a private citizen was honored for assisting the police in apprehending the defendant. Enumerated error 4 is without merit.

■ Enumerated errors 5, 9, 10 and 11 complain that the removal from the defendant's wallet of certain personal papers violated his statutory right against illegal searches and seizures. *Code Ann.* § 27-301 et seq. (Ga. L. 1966, p. 567). The purpose of the search and seizure laws is to safeguard the privacy and security of individuals against *arbitrary* invasion by governmental officials. Berger v. New York, 388 U. S. 41 (87 SC 1873, 18 LE2d 1040). "An arrest may be made for a crime by an officer, either under a warrant or without a warrant, if the offense is committed in his presence, or the offender is endeavoring to escape, or for other cause there is likely to be a failure of justice for want of an officer to issue a warrant." *Yates v. State,* 127 Ga. 813, 818 (56 SE 1017, 9 AC 620). The decedent's arrest of the defendant without a warrant was valid in view of the fact that defendant was in the process of attempting to sell an out-of-state, stolen automobile, which was in his possession and which he would likely use to escape from that

jurisdiction had the decedent gone to secure an arrest warrant. Subsequently and incidental to this lawful arrest, the police had the right to a reasonable search of the suspect. Furthermore, even if the defendant escaped from his initial arrest, he was thereafter fleeing from justice, so that his second arrest and the search complained of were justified on that ground, as well as the original ground, plus the additional ground of suspicion of murder. The search of the defendant's wallet was not unreasonable, especially since it was already known to contain the altered certificate of registration of the allegedly stolen automobile, which linked the defendant with the crime for which he was originally arrested. The court did not err in overruling the defendant's motion to suppress such evidence or in overruling his objection to testimony regarding the removal of the evidence from the defendant's person.

■ Under Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776), the trial court did not err in excluding for cause those prospective jurors who unmistakably expressed the view that their feelings toward capital punishment were such that they would never vote to impose the death penalty *regardless of the facts of the case.* *Whisman v. State,* 224 Ga. 793 (164 SE2d 719); *Jackson v. State,* 225 Ga. 790 (3) (171 SE2d 501). The term "feeling," as used by the court, referred to and was synonymous with the jurors' attitudes toward capital punishment, rather than indicating that they merely felt, rather than knew, that they would never vote to impose the death penalty regardless of the facts of the case, as is contended under enumerated error 6.

■ "The language of *Code Ann.* § 59-705 is broad, but the trial judge still retains the discretion to limit the examination of prospective jurors to questions dealing directly with the specific case." *Hill v. State,* 221 Ga. 65 (8) (142 SE2d 909). The question of whether or not any of the prospective jurors had previously served on a jury that had returned a death penalty verdict was not directly involved in this specific case. Even if it was, however, the fact that a juror may have voted to impose the death penalty in the past does not necessarily indicate an inclination to do so at the time of this trial, especially

since, as was recognized in Witherspoon v. Illinois, 391 U. S. 510, 520, supra, under the present trend in this country those favoring capital punishment are a distinct and *dwindling* minority, which necessarily means that many who formerly favored it, and even voted to impose it, now oppose it. The disallowance of this question was not an abuse of the court's discretion. Enumerated error 7 is not meritorious.

■ "It is not error for the judge in his discretion to refuse to permit the defendant to propound questions other than those embraced in the statute in order to further test the qualifications of jurors." *Cady v. State,* 198 Ga. 99, 103 (31 SE2d 38) and cit. Neither *Code* § 59-804 nor § 59-806 (Ga. L. 1855-6, pp. 230 and 231 respectively) embraces a challenge on the ground of a juror's having contributed to a fund raised for the family of the deceased. If the defendant was not satisfied with the juror's answers upon voir dire, he might have utilized the twenty peremptory challenges allowed him under *Code* § 59-805 for this purpose. The refusal of this challenge for cause was not error, as contended in enumerated error 8.

■ (a) "The statutes of this State authorizing capital punishment have repeatedly been held not to be cruel and unusual punishment in violation of the Constitution." *Furman v. State,* 225 Ga. 253 (4) (167 SE2d 628) and cases cited. Enumerated error 12 is without merit.

(b) Nor is the statute placing it within the discretion of the jury to reduce punishment to life imprisonment so vague, indefinite or uncertain as to be violative of the 14th Amendment of the United States Constitution. *Manor v. State,* 223 Ga. 594 (18) (157 SE2d 431). Enumerated error 13 is without merit.

■ Enumerated error 18 complains of the court's refusal to allow defense counsel to ask the defendant, during the course of his making his unsworn statement, whether he had shot the decedent. Even if this denial of counsel's assistance was error, it was not harmful, since the defendant stated thereafter, "I never did once remove any weapon from him *or shoot him.*"

■ There was evidence in the case as follows: The defendant attempted to sell to a used-car dealer an automobile,

his ownership of which he was unable to prove, his certificate of registration appearing to have been altered. The dealer suspected the automobile had been stolen, and the deceased police detective, who came in response to a call to the police, observed the altered certificate, returned it to the defendant, arrested him, placed him, unhandcuffed, in the rear seat of the police car, then drove off. Soon thereafter the defendant attacked the decedent, who was driving at the time. When the police car came to a screeching stop, the driver's door opened and the decedent fell out onto the pavement. The defendant, using his fist and forearms, continued to beat the decedent, who was still lying on the pavement. Then the defendant took the decedent's pistol, stepped away several paces, pointed the pistol at the deceased, who was lying prostrate on the pavement, cocked the pistol and shot him. An eyewitness standing about 12 feet away testified that, just before firing the bullet which inflicted the mortal wound, he heard the defendant say, "You m - - - - - f - - - - -, you aren't taking me no G - - d - - - place." Subsequently the police were led to where the defendant was attempting to hide. The defendant was shot because he resisted arrest by reaching for a pistol sticking out from his pocket, identified as the decedent's weapon. When the defendant fell to the ground his wallet slipped partially out of his pocket and was picked up by the police. The certificate of registration, which the decedent had allowed returned to the defendant when he was arrested, was removed from the wallet, turned over to the F. B. I., and was subsequently found to have been altered.

The above evidence was sufficient to support the verdict. The court did not err in overruling the general grounds of the motion for new trial, as urged in enumerated errors 15, 16 and 17.

■ Special ground 15 of the motion for a new trial and enumerated error 14 are as follows: "In relaying a message to the jurors in the jury room while they were deliberating, by a deputy sheriff, instead of instructing the jury in open court upon the jury's request for information concerning parole."

In support of this ground, defendant's counsel, Hons. John F. M. Ranitz, Jr. and James E. Yates, III, filed an affidavit,

deposing as follows: "That on December 12, 1968, upon trial of James C. Thacker, charged with the offense of murder, after the jury had deliberated a verdict for some 20 minutes, a juror summoned Deputy Sheriff Truman Johnson to the jury room and asked him 'If he's found guilty of manslaughter, when does he get paroled?'. Deputy Sheriff Johnson related this question to the trial judge, in chambers, and was instructed by the judge to inform the jury that he could tell them nothing about parole."

In response to a request to the clerk of the trial court to inquire into the possibility of acquiring a certificate of the trial judge showing the pertinent facts as to what actually occurred and especially as to whether the defendant knew the facts shown in the affidavit and whether he sought to or did waive the conduct of the court complained of, the following affidavit made by Mr. Ranitz was made a part of the record in this case by the trial judge:

"The purpose of this affidavit is to precisely narrate all circumstances pertaining to jury inquiry relative to parole entitlement if found guilty of manslaughter in the case of *State v. James C. Thacker*:

"The jury impaneled to try the case retired to deliberate at 6:50 p.m.; during jury deliberations defense attorney Ranitz was in the courtroom at a point approximately 25 feet distance from the door to the jury room; after the jury had deliberated a little over 40 minutes there was a knock on the jury room door and Deputy Sheriff Truman Johnson, who was in charge of the jury, opened the door to see what was wanted; a brief conversation between the juror and Deputy Sheriff Johnson ensued which conversation Attorney Ranitz was unable to hear. After the jury door was closed Attorney Ranitz inquired of Deputy Sheriff Johnson what was going on, and Johnson informed him that the jury inquired, 'If he's found guilty of manslaughter, when does he get paroled?'; Deputy Sheriff Johnson then went into the judge's chambers, and when he came out Attorney Ranitz inquired of him what had transpired, and Johnson said, 'The Judge told me to tell them that he can tell them nothing about parole.' Ranitz then returned to the courtroom and Deputy Sheriff Johnson opened the jury room door and had a conversa-

tion with a juror which Ranitz could not overhear. Almost immediately after this took place, the jury came in and returned a verdict of guilty. Several days following the trial, an affidavit was prepared by defense attorney for signing by Deputy Sheriff Johnson. It was delivered to Sheriff Carl Griffin with the request that he have Johnson sign it. A number of months later when counsel was perfecting the record of the case for appeal, it was determined that Johnson had never signed the affidavit and when inquiry was made of Sheriff Griffin, he stated that Deputy Sheriff Johnson preferred not to execute the affidavit. At the present time, the trial judge, the Honorable Dunbar Harrison, does not specifically recall this incident but states that it well could have happened because it has happened to him many times in the trial of criminal cases. Deputy Sheriff Johnson recalls that an inquiry was made of him during the jury deliberation in this case, but does not now recall any of the specifics concerning same. . .

"Order—The within and foregoing is ordered filed as a part of the record in said matter, this *14th* day of January, 1970. (Signed) Dunbar Harrison, Judge, Superior Court E.J.C. of Georgia."

This ground of the motion for a new trial is without merit or substance.

Conceding the facts as outlined the affidavit of the appellant's counsel as to the question asked by the jury and related by the bailiff to be true and that the judge told the bailiff to tell the jury, "that he could tell them nothing about parole," such did not constitute an instruction or charge to the jury. See *Leverette v. State*, 104 Ga. App. 743 (1) (122 SE2d 745), where it was said: "While it is the right of the defendant to have counsel with him at every stage during the trial of a case (see *Duke v. State*, 104 Ga. App. 494 (122 SE2d 127)), no harm resulted to the defendant, where in the absence of his counsel, the court turned the jury over to the sheriff to be taken to supper, at which time one of the jurors asked, 'What about the minimum sentence served and parole?' and the judge replied, 'The court can't answer that question; the law won't permit the court to discuss that with the jury.' This did not amount to an in-

struction to the jury, but merely to a mandatory refusal to instruct the jury on a prohibited issue."

The purpose of a charge is to inform the jury as to the law to be applied to the facts in the case. In the instant case the judge told the bailiff to tell the jury that he could not communicate with them. Even if it be treated as "a communication" by the judge to the jury and was irregular, the right to object was waived by the appellant's counsel, he being present and fully informed of the occurrence, before the jury returned the verdict.

The ruling in *Miller v. State,* 13 Ga. App. 440 (2) (79 SE 232), is applicable to the facts in this case: "After the jury on the trial of the accused for burglary had been instructed, and had been out for several hours and until late at night considering the verdict, the trial judge, with the sheriff, went to the courtroom and, in the absence of the accused and of their attorneys, inquired of the jury whether the jurors desired to be 'put to bed,' or were likely to make a verdict. Without responding to this, one of the jurors inquired of the judge as to what he had charged with reference to the right of the jury to recommend that the defendants be punished as for a misdemeanor. The judge responded that he had charged that in the event the jury should find the defendants guilty, they would have the right to recommend that the defendants be punished as for a misdemeanor, and that if such recommendation should be approved by the court, the defendants would receive a misdemeanor sentence. On the next morning, about nine o'clock, a verdict was returned, finding the accused guilty and recommending that a misdemeanor sentence be imposed. Held: (1) The statement of the judge in answer to the question of the juror did not amount to a recharge, and was equivalent to an instruction merely as to a form of verdict that the jury could return if they saw fit to do so. (2) At most it was merely a harmless irregularity and not a sufficient ground for setting aside a verdict strongly supported by the evidence, especially as it appears that the attorneys for the accused were immediately informed of the occurrence by the trial judge, and failed to make a motion for a mistrial, and did not attempt to have the error corrected in any manner until after verdict." See also *Lyman v. State,* 69 Ga. 404 (4).

The judgment overruling the amended motion for a new trial was not error.

*Judgment affirmed. All the Justices concur, except Felton, J., who dissents.*

FELTON, Justice, dissenting from the judgment and from the ruling of the majority in Division 11 of the majority opinion.

1. I have cited cases in this dissent which control over the cases cited by the majority as they are older cases and state the true constitutional principles even when no harmful effect of what was done is shown, though in this case harm may have resulted. This decision is contrary to our own Constitution and that of the United States. It deprives the defendant of due process and of the equal protection of Georgia law. *Code Ann.* § 2-104 (1945 Const., Art. I, Sec. I, Par. IV).

2. It will be seen from this supplemental certificate that some of the facts are not derived from personal knowledge of the affiant. However, this communication between judge and jury was a series of acts and words amounting to one act and, since the subject matter of the words spoken by the deputy sheriff and judge were related to the affiant so quickly after their utterance, under the law they were a part of the res gestae and proper matter for support by affidavit.

"It is the legal right of a person accused of crime in this State to be present at all stages of his trial, such right being derived from our Constitution, Art. I, Sec. I, Par. IV (*Code Ann.* § 2-104). This principle has been recognized since the establishment of this court." *Wilson v. State*, 212 Ga. 73, 74 (90 SE2d 557), citing cases applying the principle. This right applies during the recharging of the jury, and the presence of his counsel is no substitute for that of the accused. *Bonner v. State*, 67 Ga. 510; *Wilson v. State*, 87 Ga. 583 (13 SE 566); *Rider v. State*, 195 Ga. 656 (6) (25 SE2d 304).

Under the above cited rule, it is irrelevant whether or not the trial judge's response to the request for a recharge was properly phrased as a matter law (as to this see *Wilson v. State*, 215 Ga. 446 (1) (111 SE2d 32) and cit.) or whether or not harmful error affirmatively appears. " 'The accused and his counsel have the right to be present at every stage of the proceedings and per-

sonally see and know what is being done in the case. To say that no injury results when it appears that what occurred in their absence was regular and legal would, in effect, practically do away with this great and important right, one element of which is to see to it that what does take place is in accord with law and good practice.' *Hopson v. State,* 116 Ga. 90, 91 (42 SE 412); *Wade v. State,* 12 Ga. 25 (2)." *Wilson v. State,* 212 Ga. 73, 74, supra; *Seay v. State,* 111 Ga. App. 22 (3) (140 SE2d 283) and cit. Indeed, the one possible objection which could be raised against the foregoing affidavits—that they are based in part upon hearsay statements—is the best illustration of the very basis of the right to be present, i.e., the impossibility of ascertaining the exact nature and the legality of all proceedings conducted outside the presence of the accused and his counsel.

Although ". . . a defendant in this State may personally waive his right to be present, or . . . his counsel may waive this right for him when the waiver is made in the defendant's presence, [citations], . . . in order for the waiver of counsel to be binding on the defendant, it must be made in his presence or by his express authority, or be subsequently acquiesced in by him." *Wilson v. State,* 212 Ga. 73, supra, pp. 75, 77. It is true that the last paragraph of the *Wilson* decision shows facts different from those in this case, but the principle is the same. There is nothing to show that the defendant ever knew of the illegal procedure indulged in in this case, either before or after it occurred. It can be most reasonably presumed that the defendant was not being entertained in the judge's chambers when the deputy sheriff entered to convey the message from the jury. The defendant might not have been in the courtroom. It can be reasonably presumed that the attorneys for the defendant did not tell the defendant what had happened because they could see no reason to do so. It might be reasonably presumed that the defendant was informed of the facts and that he took no action either personally or through his attorneys which would show objection or acquiescence to the illegal procedure. We note here that the defendant in such a case must *himself* refuse to waive the defects in the procedure

(not a mere irregularity). From the cases cited in *Wilson,* 212 Ga. 73, supra, attorneys have no right to waive the illegal procedure for their client. What I have just said is not idle scribbling. "[A] party is not to be held, on slight grounds, to *waive* his statutory rights." *Taylor v. Holland,* 20 Ga. 11, 14. "Waiver, in fact, is a matter of proof. Its very basis is intent, and unless the facts show knowledge, and are such as to make the inference of intent natural and free from doubt, the presumption of waiver from an act ought not to arise." *McLean v. Clark,* 47 Ga. 24, 73. A clear and distinct intention to waive must appear. *Martin v. State,* 51 Ga. 567; *Simmons v. Martin,* 52 Ga. 570 (3); *Simmons v. Martin,* 54 Ga. 47, 48 (5). In *Hopson v. State,* 116 Ga. 90, supra, at p. 91, this court stated: "There was no waiver of the right of the accused and his counsel to be present when the second charge was given. It does not appear that both were ignorant of its being given until after the trial had ended; *but this makes no difference.* It is an inevitable conclusion from the cases cited above that the accused may complain of such an irregularity after verdict, *notwithstanding knowledge thereof by him or his counsel while the trial was in progress.*" (Emphasis supplied.) While mere *irregularities* in judicial proceedings may be waived (*Beall v. Blake,* 13 Ga. 217 (1) (58 AD 513)), the conduct presently under scrutiny is shown by *Hopson v. State,* supra, to be a complete *defect* which totally invalidates the proceedings, which can not be waived. *Bell v. Blake,* supra, (2, 3). "Moreover, the United States Supreme Court has held that *every reasonable presumption will be indulged against the waiver of fundamental constitutional rights by one charged with crime.*" (Emphasis supplied). 21 Am Jur2d 259, Criminal Law, § 219.

What is more, if the defendant waived anything in open court the State should show it. Once the accused shows to the court facts which prima facie constitute a deprivation of his constitutional rights, the burden then shifts to the State of showing waiver, which is a matter of proof. *McLean v. Clark,* 47 Ga. 24, 73, supra. It might be said that the accused must show error and harm in order to obtain a reversal. *Hopson v. State,* supra, and other cases cited in *Wilson v. State,* 212 Ga.

73, supra, hold this to be unnecessary, as we have hereinabove shown. Even if it were required, however, who knows whether there was harm done by the conduct of this case? Events went from a question about parole, which indicated a possibility of a verdict for voluntary manslaughter, to a very quick death sentence, in the absence of an instruction from the judge. A proper instruction from the judge could have led the jury to a verdict for voluntary manslaughter if the jury followed the instruction of the judge and had found voluntary manslaughter in the exercise of its obligation to render a verdict authorized by the evidence regardless of whether they could let the idea of parole deter them from their duty. Since the harm is presumed, however, the above speculation is irrelevant. The case of *Dutton v. Morris*, 222 Ga. 595 (151 SE2d 125), which puts the burden of proof of no waiver of presence on the prisoner in a habeas corpus proceeding, is not contrary to this holding, since such proceeding is a civil action, in which the prisoner has the burden ab initio of proving his wrongful detention.

While there is nothing to show a waiver by the defendant and what I am about to say is not necessary to a decision in this case if I am right about there being no waiver by the defendant himself, yet, if the defendant had endeavored to waive the illegal procedure, the public policy of this State prevents it. The rule is not merely made for the benefit of the accused. It is a State policy against the worst offense against a constitutional right of a defendant on trial for a crime. In such a case as this the violation of the right here involved can not be waived by a defendant because no one can waive the rights of the State in its strict policy of guaranteeing fair trials.

It seems to us that the principle that the accused has the right to be present at every stage of the trial encompasses a prohibition against any secret communication between the trial judge and the jury. While it may be true that the court could not have charged the jury on the subject of parole, the proper procedure would have been for the jury to communicate with the judge only, to advise him that it had a question to propound to him and for the court to call the jury back into the box and inquire of them what its question was, and then to make what-

ever remarks he thought to be appropriate, all in the presence of the jury, the accused and the public attending the trial. This requirement is at the top among the priorities in the State's public policy in the guarantee against star chamber proceedings in a trial involving a man's life or liberty. It matters not that the subject matter of the communication is known. The next time it may not be known and could be devastatingly harmful. This kind of thing should be stopped at the threshold the minute it comes to light. To condone what was done in this case would open the doors to the worst kinds of abuses, both intentional and through honest misunderstandings. A new trial should be granted.